Filed 1/8/15 ; ordered published by Supreme Court 4/1/15

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Z.S. et al., Persons Coming Under the Juvenile Court Law. | B252184 (Los Angeles County Super. Ct. No. CK72082) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JONATHAN A., <br><br> Defendant and Appellant; <br><br> BETHANY S., <br><br> Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Steff R. Padilla, Commissioner, and Marilyn Mordetzky, Referee.  Dismissed.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant Jonathan A.

Law Offices of Vincent W. Davis & Associates and Stephanie M. Davis for Appellant Bethany S.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Jonathan A. (father), the presumed father of D.A. and K.A., appeals from orders terminating his parental rights and the subsequent order finalizing the children's adoptions. Bethany S. (maternal grandmother) joins in father's arguments. We dismiss the appeal as untimely filed and for lack of standing.

## BACKGROUND

A petition filed April 22, 2008 by the Los Angeles County Department of Children and Family Services (DCFS) alleged that D.A., born late 2007, and his half-brother Z.S., born early 2006, were at risk of harm under Welfare and Institutions Code section 300, subdivisions (a), (b), and (as to Z.S. only) (g) and (j).[1] The children had been living with S.S. (mother), who had a history of violent altercations with father in the children's presence, including father's striking mother's face and stomach when she was pregnant with D.A. D.A. and Z.S. were placed together in foster care. The petition gave father's address as Whitney Way (the Whitney Way address), the home of the paternal grandparents. The April 18, 2008 detention report stated that father told the social worker he was staying with D.A. at the paternal grandparents' other house at "43141." A report on April 29, 2008 gave the 43141 address for father, and gave the Whitney Way address as the mailing address.

Father, represented by counsel, appeared at the April 22, 2008 detention hearing, and the court found that he was D.A.'s presumed father. Father's counsel confirmed that the address on the petition was correct and that father currently lived with the parental

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

grandparents. On May 28, 2008, at a hearing for which father waived appearance, the juvenile court sustained the petition and declared D.A. and Z.S. dependents under section 300, subdivision (a), granted father monitored visitation, and ordered DCFS to provide reunification services. D.A. and Z.S. subsequently were placed in the home of D.A.'s paternal grandparents on August 21, 2008. In June 2009, the children were placed with a foster family, after the paternal grandparents were no longer willing to care for them.

Father appeared at a progress hearing for D.A. on August 22, 2008, at which the court gave DCFS discretion to allow the paternal grandparents to monitor his visits with D.A. A status review report dated November 26, 2008 stated that father had been arrested on September 15 and remained in jail for a domestic altercation with mother and warrant issues. Father had visited D.A. sporadically since the initial detention in April 2008 and had not maintained contact with DCFS. A March 2009 supplemental report stated that father remained incarcerated and was not eligible for services, with a release date in July 2009. In April 2009, DCFS recommended that family reunification services be terminated.

Mother gave birth to K.A. in 2009, and father was later found to be K.A.'s presumed father. A petition filed May 4, 2009 alleged that K.A. was under risk of harm under section 300, subdivisions (a), (b), and (j), as K.A. had tested positive for marijuana at birth and mother's marijuana use interfered with her ability to care for him, mother and father had a history of violent altercations including father's striking mother while she was pregnant with D.A., and mother and father had not fully complied with the case plan. The petition stated that father was incarcerated at Chino State Prison. An interim review report dated May 11, 2009 stated that maternal grandmother wanted K.A. placed in her home. DCFS did not recommend placement with maternal grandmother, as there were substantiated allegations from 2003 that maternal grandmother had failed to protect mother from physical and sexual abuse. Mother was adamant that she did not want K.A. placed with maternal grandmother, as mother "'didn't want the same thing to happen'" to K.A. In June 2009, maternal grandmother indicated that after careful consideration both she and mother felt it was best that she not obtain custody of K.A.

3

The trial court found father to be K.A.'s presumed father and sustained the petition as to K.A. under section 300 subdivision (b) following a hearing on July 21, 2009. Father was present with his attorney. Father was ordered to complete parent education and domestic violence counseling and test clean in six consecutive drug tests, and his visitation was to be monitored. A status review report for D.A. and Z.S. dated October 22, 2009 stated that father visited D.A. in the DCFS office in July 2009 after father's release from prison, but had not contacted DCFS to arrange further visits, and had failed to drug test as the court had ordered. Maternal grandmother visited D.A. and Z.S. on the days scheduled for mother, who failed to show for most visits. In December 2009, the court ordered unmonitored visitation and a home evaluation for maternal grandmother over DCFS objection.

At a January 7, 2010, hearing for D.A. and Z.S., father was again incarcerated and mother appeared in custody. The court ordered the social worker and father's counsel to contact him and determine what services were available to him in prison, and continued the hearing because father was not present, ordering a statewide jail removal order for a contested hearing on February 11, 2010.

A status review report on January 19, 2010 for K.A. stated that both mother and father remained incarcerated, and recommended that reunification services be terminated. The court continued a permanent plan hearing as to K.A. on January 19, 2010 as both mother and father requested contests, ordered a supplemental report to address the services provided to incarcerated parents and K.A.'s possible placement (with his siblings) in the home of maternal grandmother, and granted maternal grandmother unmonitored visitation over DCFS objection.

Father and mother both appeared at the February 11 hearing as to all three children; the court continued the hearing to February 18 and ordered father kept in local custody in the meantime. An addendum report dated February 18, 2010, stated that father was in prison in Lancaster with a March release date. Reunification services were not available at the facility, although father stated that he had participated in some court-ordered services while in prison in Chino. At the February 18 hearing, with father

4

present while in custody and mother present, the court ordered that family reunification services be continued and granted mother unmonitored visitation with all three children during the day as well as overnight and weekend visitation at the home of maternal grandmother, over the objection of DCFS. DCFS subsequently filed a section 388 petition to change the order granting mother unmonitored and overnight visitation with D.A., and after a hearing on June 28, 2010, at which mother and father appeared, the court granted the petition, changing mother's visitation to monitored (with discretion to liberalize following clean drug tests).

A status review report on April 22, 2010 as to D.A. and Z.S. stated that mother was in partial compliance with the case plan but had tested positive for methamphetamine twice in March 2010. Father contacted DCFS in early March 2010 after his release from prison, but failed to show up for a scheduled meeting and failed to drop off promised documentation of his completion of case plan services. The report recommended the termination of family reunification services for both mother and father and the setting of a hearing on a permanent plan. A notice of the April 22, 2010 hearing on the termination of reunification services was sent to father at "4341" (the 4341 address). Neither father nor mother was present at the April 22 hearing (as to D.A. and Z.S.), and the court denied their counsels' request for a contested hearing. The court terminated reunification services for both mother and father and referred the matter for a section 366.26 hearing.

The court also ordered that father and mother be served with notice that to preserve their right to appeal the order setting the hearing, they must file a writ petition. Notice was mailed to father at the 4341 address. Father filed a notice of intent to file a writ petition, listing his address as the 4341 address. On August 2, 2010, we granted father's petition and remanded the matter for a hearing, finding that the court erred in not granting a contested hearing.[2]

Mother's contact with D.A. was restricted to monitored visitation in June 2010, with the proviso that maternal grandmother was not to be the monitor and visits were not

---

[2] Father's opening brief incorrectly states that we denied the petition.

to take place in maternal grandmother's home. A status report as to K.A. dated July 19, 2010 explained that K.A. had been moved into a third placement from his second foster home "due to allegations of neglect and absent caretaker," when he fell and fractured a femur. Father had contacted the social worker in mid-June 2010 to request a bus pass, which he picked up at the DCFS office, stating he was on his way to enroll in a domestic violence program and a parenting class and would provide proof of enrollment later. Father had not contacted the social worker again. Since K.A.'s injury, father had sporadically visited K.A. during K.A.'s visits with the paternal grandparents, who served as monitors. DCFS recommended reunification services be continued for both parents, but if the parents failed to reunify with K.A. and his siblings, the social worker would locate an adoptive home for all three children. Father appeared at a July 19, 2010 hearing after notice was sent to the Whitney Way address. The court continued the hearing for a contest requested by K.A.'s counsel.

A section 366.26 report as to D.A. and Z.S. dated August 19, 2010 recommended adoption (with all three siblings remaining together) as the most appropriate plan if the children did not reunify with mother and father. In June 2010 maternal grandmother had informed the social worker she would not pursue adoption of the children "due to a change in her living circumstances." DCFS asked the court to terminate reunification services and implement adoption placement services.

Father was personally served with notice of the August 19, 2010 section 366.26 hearing (as to D.A. and Z.S.) at the 4341 address, signing the proof of service under a handwritten statement "Jonathan lives at this address." At the August 19, 2010 hearing the court found notice proper as to father, but continued the section 366.26 hearing to November 18, 2010 (D.A. and Z.S.) because notice was not given to mother and the home study was not complete.

The court continued K.A.'s hearing to September 1, 2010. Father did not appear at the September 1 hearing, at which the court found notice proper, ordered an adoptive home study, found mother and father were both not in compliance with the case plan,

6

terminated reunification services with K.A., and referred the matter for a section 366.26 hearing, setting K.A.'s hearing for December 29, 2010.

Father was served by mail at the 4341 address with notice of the October 21, 2010 review hearing regarding D.A. and Z.S. At the October 21 hearing (at which father did not appear), the court reset the section 366.22 hearing as to D.A. for a contest pursuant to our ruling on father's writ, ordered notice to all parties, and reinstated reunification services for K.A.

Father was served by mail with a notice of the November 18, 2010 section 366.26 hearing regarding D.A. at the 4341 address. He did not appear on that date, and the court continued the hearing to the next morning. At the continued hearing on November 19, the court found notice proper to father as to D.A. and found K.A. was placed on the calendar in error, reinstating the date of K.A.'s section 366.26 hearing as December 29, 2010. The court continued the section 366.26 hearing as to D.A. and K.A. to December 29, 2010 and ordered father's counsel to provide notice to father for the continued hearing.

Father did not appear at the December 29, 2010 hearing, which the court changed to a contested section 366.22 review hearing as to D.A. (as this court had granted father's writ petition). The court again terminated reunification services as to D.A., ordered DCFS to conduct an adoptive home study, and continued the section 366.26 permanent plan hearing to April 27, 2011 as to D.A. The due diligence search for mother was not complete, so the court continued K.A.'s section 366.26 hearing, eventually setting it for June 29, 2011 after finding due diligence proper as to mother.

Meanwhile, after meeting K.S. at an adoption fair, prospective adoptive parents began the process of being matched with D.A., K.A., and Z.S. The three children were placed with the family in early 2011, and DCFS reported on April 21, 2011 that the placement was going well. Mother had not visited regularly, and father had not responded to DCFS efforts to set a visitation schedule. Maternal grandmother, however, visited regularly and had overnight visits once a month. She continued to express interest in caring for the children, but DCFS continued to oppose placement with maternal

7

grandmother, as her history of sustained allegations with DCFS was removed from her record only because of the age of the allegations.

On March 18, 2011, maternal grandmother wrote a letter to the court stating that she had been "desperately trying to gain custody of my grandchildren." Mother's opposition to placement with maternal grandmother was out of anger. Maternal grandmother had since mended her relationship with mother and was allowed to see the children. Maternal grandmother had visited them consistently. Maternal grandmother's home had been assessed but she was denied placement because of her CACI history, and she had requested review. Now the children were living with prospective adoptive parents, and maternal grandmother had lost her visitation rights. Her criminal record (welfare fraud) had not resulted in jail time. She was the most consistent person in the children's lives throughout their various placements, including the home in which K.A.'s leg was broken, and "I would like for my grandkids to live in my home." At hearings on April 21 and April 27, 2011, the court placed the children with maternal grandmother over DCFS objection. Father did not appear at either hearing.

On April 27, 2011, DCFS reported that a DCFS worker went to the 4341 address on March 10, 2011 with a notice of D.A.'s April 27, 2011 section 366.26 hearing. The worker spoke to father's uncle, who verified that father lived at that address, but the worker had just missed him and the uncle did not know when father would return. The uncle refused to accept service "because he doesn't want to get into [father's] business," but remembered the worker from a prior service attempt. The worker gave the uncle a business card and asked him to have father call. The court then continued D.A.'s hearing to June 29, 2011, the same day as K.A.'s hearing, and DCFS personally served father's attorney on behalf of father, whose whereabouts were unknown.

On June 29, 2011, DCFS reported that the children had adjusted well in the placement with maternal grandmother, who told DCFS she did not wish to adopt but preferred to be the children's legal guardian (and subsequently began the guardianship process). Neither mother nor father visited regularly. At the hearing on June 29, the

court found that father had not been properly noticed and ordered DCFS to notice him properly for a continued hearing on August 26, 2011.

On August 26, DCFS once again represented that a worker had gone to the 4341 address and had been told by father's uncle that he would not accept the notice. The worker handed the uncle a business card and asked him to have father call, but DCFS had not received any communication from father. DCFS requested permission to notice father through his attorney. The court found father had not been given notice and continued the hearing to October 26, 2011, ordering "DCFS to properly notice [father] and show proof of service for 10/26/2011."

Before the continued hearing, DCFS filed a section 387 supplemental petition on October 14, 2011 to have the three children removed from maternal grandmother's home. The petition alleged that while mother was visiting the children in maternal grandmother's home, mother had inappropriately physically disciplined the children on more than one occasion, causing bruising to K.A. on October 10, 2011, and maternal grandmother failed to prevent it. The children were placed in foster care. Five-year-old Z.S. stated that mother would come and spend the night at maternal grandmother's house, and he was afraid "'when they fight and are mad because they yell and hit us and it hurts.'"

On October 26, 2011, DCFS informed the court in a last minute information that it again had notified father of the hearing by certified mail to father's attorney; father's whereabouts were unknown. DCFS also noticed father at the 4341 address by first class mail. The children remained in foster care, but the previous caregivers and prospective adoptive parents had contacted DCFS and wished to foster the children and be considered for adopting them as a sibling group. DCFS asked that the 366.26 hearing be taken off calendar until a permanent home could be identified. On October 26, 2011, the court found notice proper, ordered that maternal grandmother have monitored visitation, and continued the hearing to April 25, 2012.

In November 2011, DCFS reported that the three children were placed in the home of the prospective adoptive parents. The allegation that mother physically abused the

9

children while they lived with maternal grandmother appeared to be true.  Maternal grandmother had allowed mother to live in the home and have unlimited, unmonitored contact with the children.

After further continuances, a status review report on April 25, 2012 stated that the children were doing well in their placement, with a loving bond to the caregivers and their biological children.  Mother routinely attended monitored visitation every other Friday for 90 minutes.  Father had shown up only for a birthday celebration for Z.S. in March 2012, when he told the social worker he would be in touch to arrange visits but did not subsequently contact the social worker.  Maternal grandmother had also had monitored visitation.  The court again continued the 366.26 hearing and ordered "counsel to notice father" for the next hearing.

DCFS subsequently mailed notices to father at the 4341 address and the Whitney Way address that on May 16, 2012, the section 366.26 hearing as to D.A., K.A., and Z.S. would be set.  On May 16, 2012, the court found notice was proper, set the hearing for September 12, 2012, and ordered the clerk to advise father (who was not present) of his right to file a writ if he opposed the setting of the hearing.  The minute order and notification setting the hearing for September 12, 2012 were mailed to father at the 4341 address.

On June 18, 2012, maternal grandmother filed a section 388 request to change court order, arguing that the children were "illegally and unlawfully detained" and the social worker had falsified documents.  She requested custody and legal guardianship of the children.  The court denied the section 388 petition on the grounds that it did not show a change of circumstances and the proposed change was not in the children's best interests.  Also on June 18, the court awarded the current caretakers de facto parent status and denied maternal grandmother similar status.

At the section 366.26 hearing as to all three children on September 12, 2012, DCFS asked the court to find mother's and father's notice was complete.  Mother's counsel (with mother present) disputed the notice, but father's counsel made no

10

objection.[3] The court found notice was proper. The court set the matter for a contested section 366.26 hearing on October 23, ordering DCFS to provide courtesy notice to father.

At the October 23, 2012 hearing the court found that notice had not been given to all parties and again continued the hearing to January 29, 2013, ordering notice to all appropriate parties. A status review report dated November 14, 2012 indicated that father had visited successfully with the children three times in the last six months (at a birthday party for K.A., a visit at the DCFS office, and for ice cream with the prospective adoptive parents present).

At the January 29, 2013 hearing, mother appeared; father's counsel was present. Counsel for DCFS stated (with no objection by father's attorney): "I have that you found notice proper to mother and [father] on September 12, 2012." Mother requested a contest. The court continued the matter to March 12, 2013 with "no supplemental report needed," stated "Minute order shall reflect today that notice is proper for the 26," and ordered the prospective adoptive parents (who were present) to return on March 12, 2013, "[t]o be questioned about the quality of visits for father." The minute order states that notice had been given to all parties for the section 366.26 hearing, and ordered all parties to return for the next hearing on March 12, 2013 without further notice.

At the continued section 366.26 hearing on March 12, 2013, father's attorney announced that father was not present and stated: "I am asking to be heard also. I just found out he is incarcerated." Mother's attorney stated that mother also was not present although "I have done my best to get notice to her," and mother "did not want to lose her

_____

[3] No notices for the September 12, 2012 hearing appear in the record. DCFS filed a motion to augment the record or for judicial notice, acknowledging that it could not find the actual notice in the court file and attaching a proof of service from the county counsel's file in the Lancaster DCFS office showing that father was personally served with notice of the section 366.26 hearing on July 26, 2012; the proof of service does not include the date of the section 366.26 hearing or the address where father was personally served. We grant the request to take judicial notice of the proof of service. We also grant DCFS's motion to augment the record with the reporter's transcript of the April 22, 2008 detention hearing.

11

children," but without mother present "I have no authority to proceed on a contest." Mother's counsel had spoken with maternal grandmother, who "is asking that regardless of whatever action the court takes today that the court consider having her visits become unmonitored." Father's counsel stated: "I'm requesting a continuance to be able to bring father in from incarceration or at least inquire of him as to whether he wishes to participate in the contest. **Notice was found proper to him in September of last year based on personal service from July 26, and again I was just given the information about his incarceration; so I don't know when he became incarcerated, but he may wish to participate in the contest on the other basis**." (Boldface added.) The court responded: "[E]ven in the most positive light to the father [the court] would need to make a basis to set the matter for a contest. Your request is denied." The court then terminated mother's and father's parental rights and found D.A., K.A., and Z.S. adoptable as a sibling set. The March 12, 2013 minute order and section 366.26 orders found notice had been given as required by law.

On the next day, March 13, 2013, the court clerk mailed a copy of the minute order and notification of rights form to father at the 4341 address. Father's notice of appeal from the termination of parental rights was stamped received but not filed on May 31, 2013. The notice gave his attorney's address and telephone number in the heading, and gave his attorney's phone number as father's phone number; father's signature was dated May 15, 2013. The superior court clerk sent father a letter through his counsel stating that pursuant to California Rules of Court, rule 8.406(a)(2), the notice should have been submitted by May 22, 2013 and was not timely.

The children's adoptions were finalized on September 19, 2013, and the court terminated jurisdiction. Maternal grandmother filed a notice of appeal in pro. per. from the section 366.26 order and from the adoption order on October 11, 2013, stating, "father not notice while jailed. I am the legal guardian and no other family members

12

were asked to adopt. . . ."[4] Maternal grandmother attached a 10-page "Appeal Attachment" disputing the removal of the children from her care. Maternal grandmother also stated that Father was incarcerated and had no notice of the March 12, 2013 hearing at which his parental rights were terminated, adding: "Due to overcrowding in the jails it takes up to three weeks for prisoners to get mail. I immediately wrote father and told him what happened and assist to appeal his case. He contacted his attorney who sent him the appeal but with mail delays, receipt and return to court resulted in court saying it was too late."

Father filed a notice of appeal in pro. per. on October 16, 2013, stating, "California Family Code 9102(b) the adoption of my children/stepson was fraudulent, I was incarcerated at the time of the parental rights hearing and was not noticed from DCFS/Court." In an attached letter, Father stated that he was incarcerated for three months prior to the hearing and was not notified of the hearing or transported so he could contest the termination of parental rights, maternal grandmother informed his attorney of his incarceration and his attorney then informed the court, and it was a violation of his civil rights for the court to proceed without him.

## DISCUSSION

### I. Father's appeal from the March 12, 2013 order terminating parental rights was untimely, and we have no jurisdiction to review the order.

Father argues that he did not receive notice of the March 12, 2013 hearing terminating his parental rights, and so the court acted in excess of its jurisdiction in issuing the termination order. He also argues that the court should have granted his

---

[4] Maternal grandmother stated she was not the legal guardian but was "sworn in as the legal guardian," on August 26, 2011. The minute order for the August 26, 2011 hearing shows that she was sworn and examined as to the duties of legal guardianship, but the court continued the hearing because father had not been given proper notice, and the letters of guardianship in the file are not signed by the court. Before the continued hearing, the children were removed from maternal grandmother's home and placed in foster care because of mother's physical abuse of the children while she visited them in maternal grandmother's home.

counsel's request for a further continuation of the hearing. The obstacle to father's arguments is that his notice of appeal from the March 12, 2013 order was untimely. The order in this case was by a referee, and therefore father was required to file a written notice of appeal within 60 days after the order became final under California Rules of Court rule 5.540(c). (Cal. Rules of Court, rule 8.406(a).) Rule 5.540(c) provides that an "order of a referee becomes final 10 calendar days after service of a copy of the order and findings under rule 5.538," which in turn provides that the referee must serve the parent "by mail to the last known address and is deemed complete at the time of mailing." (Cal. Rules of Court, rule 5.538(b)(3).) The clerk served father by mail on March 13, 2013, to father's last known address, the 4341 address, meaning that the order became final 10 days later, on March 23, 2013. Father was required to file his notice of appeal within 60 days of that date, by May 22, 2013. He did not file the notice of appeal until May 31, 2013, nine days late.

Father argues that the court sent the March 12, 2013 minute order "to a nonexistent address," and so we must first address the confusion, largely created by father's briefing, regarding father's address at the times relevant to this appeal. Father's opening brief argues that the 4341 address was invalid and "nonexistent," and that the paternal grandparents' address (the Whitney Way address) was the proper address for all service, while the 43141 address was father's "one-time residence." While the initial petition in April 2008 designated father's address as the Whitney Way address, the DCFS detention report also provides the 43141 address (likely a typographical error), as does a pre-release investigation report dated a week after the filing of the petition as to D.A. and Z.S. There are instances of the use of the Whitney Way address and the 43141 address, but at all times relevant to this appeal, father was provided with notice at the 4341 address. As respondent's brief points out, father had received personal service at the 4341 address three times (the first on June 11, 2010, when the words "Jonathan lives at this address" appear over Jonathan's signature); father's uncle (who also lived there) confirmed that father lived there; the clerk served Jonathan with his writ rights by mail at the 4341 address; and father used the address on his notice of intent to file a writ petition.

14

In partial response, father's reply brief abandons the argument that father ever lived at the 43141 address, and continues to assert that only the Whitney Way address was the proper address for service, without citing to any references to the Whitney Way address after April 2008. Father subsequently filed a notice of errata stating that "further investigation of this issue has revealed that the 4341 address is not the incorrect address. Rather, the 43141 East Avenue is the incorrect address."

Father has abandoned his initial argument that the 4341 address was incorrect. Father argues in his reply brief that his last known address at the time of the March 12, 2013 hearing was his place of incarceration. We reject this argument. No place of incarceration was provided to the court at the time of the hearing, and father acknowledges that the court was not required to conduct a prison search for father's address in custody. Father alternatively argues that the court should have sent notice of the termination order to his "designated address" (presumably the Whitney Way address), or "to the last place it believed Jonathan lived." California Rules of Court, rule 5.583(b)(3) requires that the court serve the parent by mail at the last known address, which at the time of the section 366.26 hearing in March 2013 was the 4341 address. We conclude that the court properly served father with the section 366.26 order by mail at the 4341 address.

The filing of the notice of appeal was untimely, and therefore we lack jurisdiction to consider the appeal of the termination of father's parental rights. "'[T]aking of the appeal is not merely . . . procedural . . . ; *it vests jurisdiction in the appellate court and terminates the jurisdiction of the lower court.*'" (*In re Frederick E.H.* (1985) 169 Cal.App.3d 344, 347.) "The consequences of an untimely notice of appeal . . . are not remediable. 'In the absence of statutory authorization, neither the trial nor appellate courts may extend or shorten the time for appeal [citation], even to relieve against mistake, inadvertence, accident, or misfortune [citations]. . . . If it appears that the appeal was not taken within the 60-day period, the court has no discretion but must dismiss the appeal of its own motion even if no objection is made. [Citations.]'" (*Ibid.*)

## II.     The doctrine of constructive filing does not apply.

Father requests that we apply the doctrine of constructive filing, which considers a late notice of appeal to be timely filed if the appellant is incarcerated, and the lateness of the notice of appeal is the result of negligence by prison officials relied upon by the appellant (and not due to the fault of the incarcerated prisoner).  (*In re Benoit* (1973) 10 Cal.3d 72, 81.)  "Numerous cases have held that constructive filing, which can be applied in criminal cases, does not apply in termination of parental rights proceedings . . . . [Citations.]  These cases have determined that the special need for finality in parental termination cases and the danger of imperiling adoption proceedings prevails over the policy considerations in favor of constructive filing."  (*In re Alyssa H.* (1994) 22 Cal.App.4th 1249, 1254.)[5]  Further, father makes no showing in the record that his late notice of appeal was the result of negligence by prison officials, and the mere fact of his incarceration does not suffice to excuse him from timely filing.

## III.     Father cannot collaterally attack the March 12, 2013 order terminating parental rights by noticing an appeal from the September 2013 order finalizing the adoptions.

Father also argues that his notice of appeal from the September 2013 adoption orders is a permissible collateral attack on the March 2013 order terminating his parental rights.  Father is wrong.  "Dependency appeals are governed by [s]ection 395, which provides in relevant part:  'A judgment in a proceeding under section 300 may be appealed from in the same manner as any final judgment, and any subsequent order may be appealed from as from an order after judgment . . . .'  [¶]  This statute makes the dispositional order in a dependency proceeding the appealable 'judgment.'  [Citation.] Therefore, all subsequent orders are directly appealable without limitation . . . . [Citations.]  A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a

---

[5] Father does not argue that the prison-delivery rule applying to self-represented inmates applies to him.  (See Cal. Rules of Court, rule 8.25(b)(5).)  His notice of appeal indicated that he continued to be represented by his trial counsel.

16

later appealable order." (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1149–1150.) This "waiver rule" holds "that an appellate court in a dependency proceeding may not inquire into the merits of a prior final appealable order," even when the issues raised involve important constitutional and statutory rights. (*Id.* at p. 1151.) We therefore cannot inquire into the merits of the unappealed order terminating father's parental rights.

Collateral attack of a termination order is expressly prohibited in section 366.26, subdivision (i), subdivision (1): "Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the child, upon the parent or parents and upon all other persons who have been served with citation by publication or otherwise as provided in this chapter. After making the order, the juvenile court shall have no power to set aside, change, or modify it, . . . but nothing in this section shall be construed to limit the right to appeal the order." "This statute forbids alteration or revocation of an order terminating parental rights except by means of a direct appeal from the order." (*In re Meranda P.*, *supra*, 56 Cal.App.4th at p. 1161.) Further, "habeas corpus may not be used to collaterally attack a final nonmodifiable judgment in an adoption-related action where the trial court had jurisdiction to render the final judgment." (*Adoption of Alexander S.* (1988) 44 Cal.3d 857, 867–868; see *In re Issac J.* (1992) 4 Cal.App.4th 525, 532–533.) This action is adoption-related, as father appeals from the adoption order, and the court had jurisdiction to terminate parental rights under section 366.26. He may not use this appeal to mount a collateral attack on the section 366.26 order.

Father attempts to avoid this bar by arguing that errors in notice of the termination hearing rendered the dependency court without jurisdiction to terminate his parental rights at the hearing on March 12, 2013. Even if notice to father were deficient, however, that would not constitute a lack of fundamental jurisdiction, which "'refers to a court's power over persons and subject matter.'" (*In re Angel S.* (2007) 156 Cal.App.4th 1202, 1209.) In a less fundamental sense, jurisdiction "'refers to a court's authority to act with respect to persons and subject matter within its power. [Citation.] Issues relating to jurisdiction in its fundamental sense indeed may be raised at any time. [Citations.] By

contrast, issues relating to jurisdiction in its less fundamental sense may be subject to bars including waiver . . . [citation] and forfeiture . . . [citation].'" (*Ibid.*) When a court with fundamental jurisdiction over the persons and subject matter in question acts contrary to a statutory procedure or applicable rules, it does not act without jurisdiction, but rather in excess of jurisdiction. (*Ibid.*) "Acts in excess of jurisdiction are not void in any fundamental sense but are, at most, voidable if properly raised by an interested party." (*Ibid.*) Here, the children were the subject of a dependency petition, and the juvenile court had fundamental jurisdiction to exercise its power to terminate parental rights. (See § 366.26.) A failure to follow mandated statutory procedures such as service of notice to father at his last known address is an act in excess of jurisdiction which, even had it occurred, father cannot challenge via a collateral attack.

Father also argues that collateral attack is permissible because his appeal of the termination order is pending and therefore the order is not final. (See *In re Darlice C.* (2003) 105 Cal.App.4th 459, 466.) As we explain above, however, no appeal of the termination order is pending as father did not file a timely appeal, and collateral relief is unavailable "'where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment.'" (*Adoption of Alexander S.*, *supra*, 44 Cal.3d at p. 865.)

## IV.    Father has forfeited review of the alleged defects in notice, and even if he had not, any error was harmless.

Father argues that the court violated his right to due process by failing to provide proper notice of the March 12, 2013 hearing. Father was represented throughout, and his counsel acknowledged at the hearing that notice to father had been found proper, and did not argue that father did not receive notice. This waives his argument that notice was defective. Even "[a]ssuming proper notice was not given, [father's] failure to raise the defect at the . . . hearing constitutes a waiver of the issue on appeal." (*In re Gilberto M.* (1992) 6 Cal.App.4th 1194, 1198; see *In re B.G.* (1974) 11 Cal.3d 679, 689.)

If we were to consider father's argument on the merits, we would conclude that father received adequate notice of the March 12, 2013 hearing at which the court terminated his parental rights as to D.A. and K.A. Section 294 governs the notice

18

required for a section 366.26 hearing, including a requirement that notice be given to the presumed father. (§ 294, subd. (a)(2).) "Regardless of the type of notice required, or the manner in which it is served, once the court has made the initial finding that notice has been properly given to the parent, . . . subsequent notice for any continuation of a Section 366.26 hearing may be made by first-class mail to the last known address . . . or by any other means that the court determines is reasonably calculated, under any circumstance, to provide notice of the continued hearing." (§ 294, subd. (d).)

Father was personally served with notice of the initial section 366.26 hearing (for D.A.) on August 19, 2010, at which he failed to appear. Although DCFS states that he was also personally served with notice for the initial section 366.26 hearing for K.A. on December 29, 2010, no such personal service appears in the record, although on September 7, 2010 the court mailed father (at the 4341 address) a copy of the September 1, 2010 minute order setting the section 366.26 hearing as to K.A. for December 29, 2010. The first section 366.26 hearing as to K.A. (as to D.A., a continued hearing) was held on September 12, 2012. As we explained above, DCFS admits the record does not contain any notices for the September 12, 2012 hearing. The proof of service from the county counsel's file in the Lancaster DCFS office for all three children showing that father was personally served with notice of the section 366.26 hearing on July 26, 2012 does not include the date of the section 366.26 hearing or the address where father was personally served. Father failed to appear at the September 12, 2012 hearing, where the court made its initial finding that notice was proper. At a continued hearing on January 29, 2013, DCFS counsel stated (with no objection from father's counsel) that the court had found notice proper to father on September 12, 2012, and the court agreed that notice was proper. Father's own counsel repeated at the March 12, 2013 hearing that notice was found proper to him in September 2012, based on personal service from July 26. Counsel for DCFS and father thus agreed that notice was proper to father for the September 12, 2013 section 366.26 hearing (the first as to both D.A. and K.A.) based on personal service from July 26. Either father or his attorney received notice of all the continued hearings, by mail or through the attorney's presence at the hearings when the

19

continuance date was set. Even in the absence of direct evidence of notice, the court could infer that father had actual notice "because [his] appointed counsel had notified [him] of the continued hearing dates" pursuant to the statutory obligation to provide competent representation, especially given counsel's failure to contest the court's findings of proper notice. (*In re Phillip F.* (2000) 78 Cal.App.4th 250, 259.)

Only the failure to attempt to give notice to a parent is a structural defect requiring automatic reversal (*In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1116) and father has made no showing that DCFS made no effort to give him notice. Even considering the absence from the record of the complete notice to father on July 26, 2012 as a showing of error in notice to father of the initial section 366.26 hearing as to K.A., any error was harmless beyond a reasonable doubt. (See *In re Angela C.* (2002) 99 Cal.App.4th 389, 395.) Father, who failed to maintain contact with DCFS, visited the children only sporadically, and often did not appear at noticed hearings even while not incarcerated, does not explain how the result of the section 366.26 hearing would have been different if the record reflected perfect compliance with section 294. He does not argue that D.A. and K.A. would not have been found adoptable at the section 366.26 hearing or that his parental rights would not have been terminated had he been present. By the time of the section 366.26 hearing, parental unfitness has been shown and the focus of dependency proceedings is determining the proper placement for the children. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728.) If clear and convincing evidence exists that the children will be adopted, and a previous decision has been made that reunification services should be ended, the "termination of parental rights . . . is relatively automatic," unless the parent can show that termination would be detrimental. (*Ibid.*) Father does not argue, and the record does not show, that he had maintained regular visits with the children and that they would be benefited from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(1); *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155–1156.)

**V.    The juvenile court did not abuse its discretion in denying father's request for a continuance.**

Section 352, subdivision (a) provides that the juvenile court may continue a hearing if it is not contrary to the interest of the minor, given the child's need for a prompt resolution of custody status and a stable environment, and the damage of prolonged temporary placements. We will reverse an order denying a continuance only upon a showing that the court abused its discretion. (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.) At the March 12, 2013 section 366.26 hearing, father's counsel admitted that father had notice of the hearing since July 2012, but as she had just learned he was incarcerated, she requested a continuance to bring father to court from incarceration, or at least to ask him if he wanted to contest the termination of his parental rights. The court responded that without any offer of proof as to the basis for father's contest, the request would be denied. This was within the court's discretion. The section 366.26 hearing had been repeatedly continued and it was not arbitrary to decline to further delay the hearing on the basis that father, at the last minute, might wish to contest the termination of his parental rights. A further continuance would not have been in the children's best interests, and on this record "[t]here is no indication a different result would have occurred had [father] been present." (*In re Gerald J.*, at p. 1187.)

**VI.    Maternal grandmother does not have standing to appeal, and father does not have standing to appeal the adoption order.**

Maternal grandmother simply joins in father's arguments regarding the March 12, 2013 order terminating parental rights. She was not a party to the proceeding terminating father's parental rights, and she makes no argument that she was aggrieved by the termination order as "one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236.) She therefore has no standing to challenge the orders terminating parental rights and finalizing the adoptions. For similar reasons, father has no standing to challenge the order finalizing the adoptions. "A parent's appeal from a judgment terminating parental rights confers

21

standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights." (*Id.* at p. 238.) A reversal of the order finalizing the adoption would not advance any argument father might make against terminating his parental rights, and he therefore has no standing to appeal the adoption order. The appeal must be dismissed in its entirety.

## DISPOSITION

The appeals are dismissed.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.