Filed 9/23/16  S.R. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| S.R.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF DEL NORTE COUNTY,<br><br>    Respondent;<br><br>DEL NORTE COUNTY DEPARTMENT OF HEALTH & HUMAN SERVICES,<br><br>    Real Party in Interest. | A148145<br><br>(Del Norte County<br>Super. Ct. JVSQ 15-6090) |

S.R., father of G.R., petitions for extraordinary writ relief seeking review of a juvenile court order terminating his reunification services and setting a permanency planning hearing for G.R.  (Welf. & Inst. Code, [1] § 366.26; Cal. Rules of Court, rule 8.452.)[2]  S.R. challenges the order on various grounds.  Real Party in Interest Del Norte County Department of Health & Human Services opposes the petition.  We deny the petition for an extraordinary writ on the merits.

---

[1]    All unspecified statutory references are to the Welfare and Institutions Code.

[2]    G.R.'s mother is not a party to this writ proceeding.

1

## A. Background

S.R. (father) and J.M. (mother) are the parents of G.R. (the child), who was born in August 2009. Before the incident leading to the juvenile dependency proceeding under review, father and the child were living together in Crescent City, California, and mother's whereabouts were not known. On June 7, 2015, while father and the child were in Oregon, the child developed an ear infection and father took the child to a hospital. The child appeared in "disheveled" clothing, and appeared to be "malnourished." Hospital staff contacted Oregon child welfare services due to father's irrational and erratic behavior in the hospital. Following an investigation, the child was detained by Oregon law enforcement and child welfare services. The child was sent back to California and placed in a licensed foster care home in Del Norte County. On June 8, 2015, "Oregon held a shelter hearing" and dismissed the matter.

## B. Del Norte County Juvenile Dependency Proceeding

On June 9, 2015, Del Norte County Department of Health & Human Services (the agency) filed a juvenile dependency petition, alleging, in pertinent part, that the juvenile court should exercise jurisdiction over the five-year-old child as a person described in section 300, subdivision (b) (failure to protect). Notice of the detention hearing to be held on June 10, 2015, was personally served on father on June 9, 2015, at 3:50 p.m. Additionally, ICWA [Indian Child Welfare Act] notice was given to Tolowa Dee'Ni Nation "normally known as Smith River Rancheria," as father and the child were enrolled members of the tribe.

### 1. Detention Hearing

At the June 10, 2015, hearing, father was present in court represented by assigned counsel. Tolowa Dee'Ni Nation ICWA Advocate appeared by telephone. Father gave notice to the court of a mailing address in Washington State. Before the court addressed the petition, the court informed father of the purpose of the detention, jurisdictional and dispositional hearings, that if the child was removed that day, father would be entitled to reunification services limited to 12 months, and if father did not participate regularly in a

court-ordered treatment program, he might lose custody of the child and the child might be placed for permanent adoption. The court then heard testimony regarding father's motion to dismiss on the ground the court did not have jurisdiction over the child because father did not reside in California.

Father testified, in pertinent part, as to the family's circumstances before the child had been detained in Oregon. He had recently suffered a decline in finances, and he and the child came to California with the intent of living here and finding a permanent residence as father had qualified for a $1,500 "Indian grant." For the last month and a half, the family lived in Crescent City, California. Father received state aid to pay for hotels while looking for a permanent residence and he had found temporary housing after he had exhausted "hotel housing." Father acknowledged he had previous dealings with the agency. He testified agency social workers had assisted the family, by providing "food" and "TANF" aid. However, according to father, the agency social workers never offered him "mental, substance, or parenting" services because they said he was a good father and his case was closed. Although it was his intent to make Crescent City his permanent home, father never found a permanent home. Following the death of the child's paternal grandfather, father decided to move back to Washington State, where he had family. While on the way to Washington State, the child developed an ear infection and father sought medical care for the child in Oregon. He never changed his and the child's "address." He considered his current residence to be his father's home in Washington State "as of five days ago."

Agency social worker Irene Moreno testified that before father and the child came to California, the family "was bouncing from one relative to another throughout Washington and Oregon." Moreno believed the family had been receiving county services for a few months before the child's detention. In June 2015, the agency social workers had paid for hotel housing for father and the child and had referred father to other agencies in the community to help him secure permanent housing. The family was currently receiving California state benefits in the form of Medi-Cal through the county, and the child was enrolled in school in Crescent City.

The agency submitted the issue of detention on its report, which was admitted into evidence without objection. The court also heard argument by counsel on the issue of the court's jurisdiction. The juvenile court ruled that "Del Norte County is the [child's] domicile. We have jurisdiction. [Father] stated on the stand he had, within the past month, obviously he's been here, at least 13 contacts with law enforcement. He only considered Washington his domicile since his father died. Apparently, that's on June 5th, this very month. [¶] That he was heading up there, and that his child goes to school here as well, so it's clear . . . this court has jurisdiction . . . ." The court further found a "prima facie showing" was made that the child was a person described by section 300, and there was a "substantial danger to the physical health of the child, or the child is suffering severe emotional damage and there are no reasonable means to protect[] the child's physical or emotional health without removing [the child] from the [father's] . . . physical custody. . . ." The court ordered the child removed from father's custody and the child was temporarily placed with the agency. Father was granted supervised visits with the child five hours per week at the agency. Additionally, the agency was directed to provide father with the following reunification services: parenting classes, random drug screens/drug monitoring, substance abuse assessment and any recommended treatment, and mental health assessment and any recommended treatment. The court scheduled a jurisdictional hearing for June 19, 2015.

### 2. Jurisdictional Hearing

At the June 19, 2015 jurisdictional hearing, Tolowa Dee'Ni Nation ICWA Advocate was present in court. Father's counsel was also present in court. Father initially appeared by telephone. Father's counsel noted father was unaware there was a court proceeding scheduled for that date. The agency's counsel informed the court father was present in the courtroom at the detention hearing when the court scheduled the jurisdictional hearing for June 19. Therefore, "all parties who are here or who need to be here were here last time and ha[d] actual notice." Father's counsel asked the court for a continuance because the agency had failed to mail a copy of the agency's report to father's Washington State address and father had not had a chance to review the report

4

with counsel. The court then discussed with father and his counsel the requested continuance and the need for a time waiver. When father indicated he did not understand the concept of a time waiver, the court directed his counsel to explain the concept to him. Before counsel could secure father's waiver, father said, "My phone is dead," and he apparently hung up. The court directed father's counsel to reconnect by telephone with father, but the calls went directly to voice mail, which was not set up to receive messages. The court informed counsel that even without father's consent, counsel could agree to a 10-day continuance. Father's counsel expressed concern about continuing the matter without securing father's time waiver based on counsel's prior interactions with father. Ultimately, father's counsel consented to the court holding the jurisdictional hearing in father's absence.

The agency submitted on its jurisdictional report, which was received in evidence without objection. After all the parties indicated there was no other evidence to offer, the court heard argument by counsel. The juvenile court found that all necessary parties had been given notice of the jurisdictional hearing as required by law, that father "was present earlier . . .[a]nd it appears to the court voluntarily has decided not to continue participating in today's court appearance." The court further found the child's residence was Del Norte County, and the court had jurisdiction of the matter. The court also found true the allegations contained in the petition as to father. The court ordered the child to remain detained and scheduled a dispositional hearing for July 17, 2015, which was later continued, on the court's own motion, to July 24, 2015 at 2:00 p.m.

### 3. Dispositional Hearing

Before the dispositional hearing, Tolowa Dee'Ni Nation apprised the court that it planned to intervene in the case. Additionally, the agency filed its report recommending that the child be declared a dependent of the court and that the court offer father reunification services. The agency social worker opined that father's absence from California, coupled with his refusal to speak to any agency social workers assigned to the case, was a significant obstacle in ensuring the child's safety if the child was returned to father. In support of the recommendation, the agency social worker reported that father

5

refused to speak with agency social worker Irene Moreno. For example, on June 15, 2015 father hung up on Moreno, saying he would only speak with Jerry Her, an "eligibility" worker. Three days later, father informed Moreno he would not speak with her, the child, or agency supervisor Susan Wilson—but only to "his social worker, Jerry Her," who is an "eligibility" worker. The pastor of the church attended by father reported to the agency social worker that father intended to "fight the system" and "does not want to cooperate with the [agency]," and father "refuses to drug test, do parenting classes, or any mental health assessment." Regarding father's mental health, the pastor noted father had difficulty grasping and perceiving "reality." The agency social worker concluded the report in the following manner: "The [agency] would like to work with the parents to determine how best to encourage and support their efforts to reunify with their child. The [agency] is very concerned with [father's] refusal to talk to staff but more importantly to talk to [the child] who most likely feels abandoned for the second time by one [parent]. . . . [¶] Due to [father's] unstable mental health, his unwillingness to interact within [society's] acceptable boundaries, and his refusal to communicate or cooperate with Child Welfare, the [agency] has no[] option other than to recommend [the child] remain in foster care and reunification services be offered."

At the July 24, 2015, disposition hearing, Tolowa Dee'Ni Nation ICWA Advocate was present in court. Father appeared by telephone, with assigned counsel present in court. At the outset of the hearing, father "repeatedly interrupted" the proceedings, by either commenting on statements being made in the courtroom or stating he could not hear what was being said in the courtroom. He asked the court to dismiss his counsel based on a conflict of interest, and he wanted a continuance because he was then attending his father's eulogy and funeral services. The court told father that no one had asked for a continuance, that he would be allowed to testify, and he could renew his motion to dismiss his counsel at the end of the evidentiary portion of the hearing. Father replied he did not want to provide testimony, he needed to dismiss his counsel, and again moved to continue the proceeding so that he could be present in the courtroom. The

6

court repeated it was not immediately prepared to hear father's requests but that father would have an opportunity to testify at an appropriate time during the hearing.

The court then heard testimony from ICWA expert Tolowa Dee'Ni Nation ICWA Advocate Paulie Hawthorne, who was qualified as an ICWA expert over father's objection. Hawthorne was currently working with a family member who lived in Oregon to arrange for "an I.C.W.A. preferred placement" for the child. Hawthorne also described the agency's "active efforts," "above and beyond . . . reasonable efforts," to keep the family together. [3]

At the end of Hawthorne's testimony, father's counsel renewed father's request for a continuance. Counsel for the agency and the tribe objected to a continuance. Father's counsel explained that the court hearing was originally scheduled for July 17, but had been moved by the court to July 24, which created a conflict for father who was already scheduled to attend his father's funeral eulogy on the latter date. The court denied the request for a continuance, commenting that father voluntarily left California on his own accord and never returned to visit with the child after the child's detention, father had actual notice of the changed date for the hearing, and he sought permission to appear by telephone. The court then noted "for the record it appears [father] on his own accord decided to hang up," during the hearing. The court asked father's counsel to telephone father, who then rejoined the proceedings.

Father renewed his request to dismiss his assigned counsel and informed the court he was going to hire his own counsel. The court refused to relieve assigned counsel as father had not shown counsel had a "conflict of interest." The court told father that he was free to hire counsel to represent him at any time. Father continued to request a

---

[3] During Hawthorne's testimony, father continued to interrupt the proceedings, by either stating he could not hear the testimony being given in the courtroom or commenting on the testimony being given in the courtroom. After admonishing father not to interrupt Hawthorne's testimony the court told father he had been put "on mute" to prevent him from interrupting the testimony. When father stated, "Objection," the court asked Hawthorne to move her chair closer to the microphone in the courtroom. The court then noted father had hung up. The court then proceeded to hear the remainder of Hawthorne's testimony.

continuance so he could properly present his case with counsel of his own choosing. Before the court could respond, father "just hung up again." The court then proceeded to hear argument from counsel on disposition.

The juvenile court ruled on disposition in the following manner. It initially found "notice [had] been properly given" to all parties, stating that father had appeared by telephone but he decided to hang up of his own accord. The court received into evidence the agency's dispositional report. The court found the child was an Indian child within the meaning of the ICWA and that Tolowa Dee'Ni Nation was the child's tribe. The court also found, by clear and convincing evidence, including the testimony of the ICWA expert, that the continued custody of the child by father was likely to result in serious emotional or physical danger to the child; and "[a]ctive efforts were made to eliminate the need for removal of the child from [the child's] home and to prevent the breakup of the Indian family and those efforts ha[d] proved unsuccessful." The child was declared a dependent of the court, and the agency was directed to provide family reunification services to father, who was ordered to comply with the court-approved case plan.

### 4. Six-Month Status Review Hearing

On February 10, 2016, the agency filed its report for the six-month status review, originally scheduled for February 19, 2016, and then rescheduled to February 22, 2016. The agency recommended that the court terminate father's reunification services and schedule a section 366.26 hearing to determine the child's permanent placement. The agency social worker reported the agency had "had no contact with [father] since approximately July 24, 2015 and d[id] not have the ability to access his current situation" and father had not participated in any of his court-ordered case plan. On November 9, 2015, the child had been placed in the home of the child's paternal great-uncle in Oregon, and the child was reported to be doing well. In January 2016, the paternal great-uncle informed the agency that father had weekly Skype visits with the child. However, whenever the agency social worker called father to facilitate a telephone visit between father and the child, father hung up without speaking to the child. With regard to father's progress in addressing the problems that lead to the dependency, the agency social

8

worker reported father had not participated in any of the programs recommended by the agency, he had not participated in any of his court-ordered case plan, he had left California, he had not contacted the agency and refused to talk to anyone when contacted by agency social workers, and he had not contacted or participated in the Positive Indian Parenting program as recommended by the agency.

On February 22, 2016, father appeared by telephone, with assigned counsel present in court, for the scheduled six-month status review hearing. Once again father moved to dismiss his assigned counsel and requested two months to secure new counsel. Father also said he had not received the agency's report for the hearing; he had moved and the report had not been forwarded to him. Father gave the court his new address in Las Vegas, Nevada. The court continued the hearing for two weeks. On March 7, 2016, father appeared in court for the continued hearing. He reported he had been unable to retain counsel, and again asked for a continuance and dismissal of his assigned counsel. Following a *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118), the court relieved father's assigned counsel, appointed new assigned counsel, and continued the matter for 35 days to April 11, 2016.

On April 11, 2016, the juvenile court held the six-month status review hearing. Father appeared by telephone, with new assigned counsel present in court. Tolowa Dee'Ni Nation ICWA Advocate also was present. By that time the child had been detained for 10 months (since June 10, 2015) and had been living for five months (since November 9, 2015) in the home of the paternal great-uncle in Oregon. The court heard testimony from agency social worker Marci Clough, who had worked with the social worker first assigned to the case; Clough was later assigned as the ongoing court social worker for the case and had been so assigned for the last month and a half. According to Clough, she and the social workers assigned to the case had attempted to contact father on several occasions by telephone but he never answered and father's telephone did not have voice mail set up to accept messages. Clough had not formulated father's case plan, but she believed the agency had offered "A.O.D. [Alcohol and Other Drugs] services, parenting classes and maybe a mental health evaluation or assessment." There had been

9

no attempt by father to participate in services, and as far as Clough knew, there was no issue preventing father from participating in services. According to Clough, father would have been able to access similar reunification services where he was living but his failure to return phone calls or communicate with the agency impeded referrals. Clough also testified concerning the agency's mailing of reports to father. She stated that when father was living in Washington State, the agency had a valid address for him, all the reports were mailed to him, and none of them came back. Clough mailed father a copy of the six-month status review report, which had attached a copy of father's case plan, and the agency did not receive the mail back. Assuming father had not heard from the agency, he had been provided the agency's contact telephone number and he could have called the agency to obtain information regarding the requirements of his case plan to facilitate reunification with the child. Clough opined there was no real likelihood that further services would result in the family's reunification because father had no visits with the child, and he had made no attempts to either rectify the problems that caused the agency to intervene, or participate in any services.[4] The agency then submitted the matter on its report prepared for the six-month status review hearing.

Father testified that when he initially arrived in Crescent City, he received assistance through an agency social worker. Two weeks before the child's detention, he met with several agency social workers who were helping him secure housing. An agency social worker told father he was a good father. However, the agency did not offer services at that time and the case was closed. Father also testified regarding the

---

[4] Following Clough's testimony, father informed the court that the battery on his telephone was low and he did not have the ability to charge the telephone at that time. The court directed father to hang up and directed father's counsel to attempt to reconnect a telephone line so that father could participate in the proceedings. In the interim, father's counsel requested a continuance for a week to allow father to appear in person or by telephone. After father was able to reconnect by telephone and rejoin the court proceedings, the court denied the motion to continue the matter. The court also noted that father had earlier requested a continuance to allow him to appear in person, and he had over 30 days to either travel to California, charge his telephone, or find a hard line telephone to communicate with the court.

circumstances that lead to the child being detained in Oregon and the child's continued detention in California. Father testified he had not worked with any of the social workers assigned to the juvenile dependency case because he wanted to communicate only with "Pastor Rogers," his uncle, or Del Norte County social worker Jerry Her. Father also testified he never had a case plan and, to his knowledge, he never saw a case plan or had in his possession a copy of the document called a case plan. He admitted that after the child was detained, the agency "gave [him] a foot worth of paperwork that has the rules and guidelines and all [his] research and evidence." But, father testified the paperwork did not include a case plan and there was no communication "to do any of that." Father explained he had some medical issues that interfered with his ability to contact the child in person, and he maintained regular contact with the child through Skype. If the court offered father additional reunification services, he was willing to participate in services "with adequate research and looking into the services and who is offering them and whether they are warranted or justified I would more than entertain the idea, especially at this juncture." Moreover, he repeated he was only willing to work with "Jerry Her, my pastor or my uncle," or "a reasonable social worker." Father asserted that several agency social workers had been assigned to the case and he did not know who was in charge of the case at the time of the hearing.

On cross-examination, father was questioned about his presence at several previous hearings regarding the child. Father testified that at the detention hearing he was either physically present or he may have appeared by telephone briefly. Father was not sure what the court ruled at the detention hearing with regard to his participation in certain services, as his former counsel was not communicating with him at the time. Father had not participated in any reunification services because it took three months to settle his father's estate, he then moved to Las Vegas, and he had medical conditions. He confirmed, however, that at the March 7, 2016 hearing, he told the court he did not want any contact and refused to work with agency social workers assigned to the case, and he had maintained that position throughout the case. However, father was "now willing to engage" in services.

Following argument by counsel, the court terminated reunification services for father and scheduled a section 366.26 hearing for August 1, 2016. In so ruling, the court stated, in pertinent part: "There's an old saying you can lead a horse to water but you can't make it drink. One must have a willful desire to participate. It's clear to the court [father] does not have a willful desire to participate. He has hung up on social workers whenever they call. [¶] He has moved without notice to the court, without notice to the [agency] and without notice to the tribe where he could be found. He admitted during his testimony that he has read a foot high stack of paperwork and doesn't know what they contain. [¶] Children cannot wait for their parents to grow up. They are entitled to stability. So the court does not find [father's] testimony credible. He could not recall whether he was present and not absent. . . . [¶] . . . [The] testimony is that he did receive his case plan by mail. He did give an address he provided to all parties where he wanted to receive his mail. It did not come back unreturned. [¶] He desires to say I will only engage in the case plan if certain individuals, Mr. Her or his uncle, provide[ ] the plan to him. Appears to be fully manipulative . . . . [¶] It appears to the court he did not bother to inform anyone of his move to Nevada. . . . [¶] He cannot personally duck and hide from the case plan and services and actively try to derail the process and then turn around and claim the services were not provided when you actively and purposely refuse to speak to the people providing you services and refuse to tell them where you reside and where you moved to." In the course of announcing its finding terminating father's reunification services, the court further commented that father's refusal to communicate with agency social workers "weigh[e]d heavily" with the court. The court found that the agency had provided or offered reasonable services, but father had made " insufficient" progress toward alleviating or mitigating the causes necessitating placement of the child in foster care.

Father timely filed this petition challenging the April 11, 2016, order, and we issued an order to show cause and temporarily stayed the scheduled section 366.26 hearing, subject to further order of this court.

12

**DISCUSSION**

Father challenges the April 11, 2016, order on the grounds that venue was improper, his residence in Washington State was dealt with as an inconvenient fact that had no bearing on the case, he did not receive critical reports on a timely basis, he was unable to personally attend crucial hearings because of a family crisis, he did not receive due process at the detention, jurisdictional and dispositional hearings, he did not have a particular social worker to work with him, he had unique rights under the ICWA that were for the most part entirely ignored, and the agency did not make meaningful efforts to assist him with reunifying with the child. He asks us to vacate the April 11, 2016, order and remand the matter with directions to the juvenile court to issue a new order directing the agency to provide "meaningful services" and transferring the case to his home state of Nevada. As we now discuss, father's contentions are either not properly before us or do not require reversal.

Father's time to appeal from the orders entered after the detention, jurisdictional, and dispositional hearings has run. Accordingly, his arguments of improper venue, violations of ICWA and due process, and ineffective assistance of counsel, directed at those orders, are not properly before us. (§395; see *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1149-1150 (*Meranda P.*).) This general forfeiture rule, which "holds 'that an appellate court in a dependency proceeding may not inquire into the merits of a prior final appealable order,' " applies " 'even when the issues raised involve important constitutional and statutory rights.' (*Meranda P., supra*, at p. 1151.)" (*In re Z.S.* (2015) 235 Cal.App.4th 754, 769-770; see *In re Jesse W.* (2001) 93 Cal.App.4th 349, 355.) "[T]o fall outside the [forfeiture] rule, defects must go beyond mere errors that might have been held reversible had they been properly and timely reviewed. To allow an exception for mere 'reversible error' of that sort would abrogate the review scheme [citation] and turn the question of [forfeiture] into a review on the merits." (*In re Janee J.* (1999) 74 Cal.App.4th 198, 209.) In this case, father presents no valid basis to disregard this general forfeiture rule. The record reveals no defect that fundamentally

13

undermined the statutory scheme such that father was prevented from availing himself of the protections afforded by the scheme as a whole. (*Ibid.*)

Father appears to challenge the April 11, 2016, order on the ground that there was insufficient evidence to demonstrate the agency made a "meaningful effort" to assist him to reunify with the child. As an appellate court, "[w]e have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) Father asks us to consider isolated portions of the agency's six-month status review report and testimony elicited at the six-month status review hearing. However, the juvenile court was not required to accept those portions of the agency's report and the testimony cited by father. (*Sprague v. Equifax, Inc* (1985) 166 Cal.App.3d 1012, 1028.) Relying on other portions of the agency's report and other testimony, the juvenile court reasonably found the agency had made efforts to contact father but he refused to speak with the agency social workers or otherwise participate in reunification services, and father had failed to keep in contact with the agency. The juvenile court could also reasonably find father made no efforts to determine what he was required to do in order to regain custody of the child, and he was not prevented from contacting the agency social workers or otherwise securing reunification services in his home state to reunify with the child. The juvenile court was not required to accept father's reasons for failing to communicate and participate in services for the 10 months the child had been detained. Nor is there anything in the statutory scheme supporting father's implicit argument that the agency "had a duty to track him continually throughout the dependency process even after he had been identified, contacted by a social worker, apprised of the proceedings, provided with counsel and participated in hearings. . . . The [agency] has a duty initially to make a good faith attempt to locate the parents of a dependent child. Once a parent has been located, it becomes the obligation

14

of the parent to communicate with the [agency] and participate in the reunification process." (*In re Raymond R.* (1994) 26 Cal.App.4th 436, 441.) "[I]t is not the court's role to force a parent to participate in services. 'It is . . . well settled that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent. [Citation.]" [Citation.]' [Citations.] " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233.) "A parent whose child [] ha[s] been adjudged [a] dependent[] of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent . . . waits until the impetus of an impending court hearing to attempt to [correct his or her own behavior], the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go 'on hold' while the parent makes another stab at compliance." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)[5]

## DISPOSITION

The petition for an extraordinary writ is denied on the merits. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452(h).) Our decision is final immediately. (Cal. Rules of Court, rules 8.452(i) & 8.490(b)(2)(A).) This court's stay of the section 366.26 hearing, previously issued on July 6, 2016, shall be dissolved on the filing of this opinion.

---

[5]     Father also appears to challenge the April 11, 2016, order on the grounds that "[h]e had unique rights under the Indian Child Welfare Act that were for the most part entirely ignored," and the case should have been transferred to his then home state of Nevada. However, father presents no "meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim[s] of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Consequently, father's contentions are "without foundation" and we decline to further address them. (*Ibid.*)

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.