200 P.3d 689 (2009)
In re the CUSTODY OF A.C.
David Nagel and Anita Bangert, Respondents,
v.
Holly Marie Cork, Appellant.
No. 79938-5.
Supreme Court of Washington, En Banc.
Argued February 12, 2008.
Decided February 5, 2009.
Andrea M. Poplawski, Burke & Associates Law Office, PLLC, Spokane, WA, for Appellant.
David James Crouse, Attorney at Law, Spokane, WA, for Respondent.
*690 CHAMBERS, J.
¶ 1 A child and his mother are from Montana but moved to Washington. The child's former foster parents, still living in Montana, asked Washington courts to grant them custody. Washington has adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), ch. 26.27 RCW; see also Unif. Child Custody Jurisdiction & Enforcement Act, 9 pt. 1A U.L.A. 655 (1997). Under that act, because the foster parents live in Montana and seek to modify a custody determination initially made by Montana, and because Montana has never declined jurisdiction, Washington courts do not have jurisdiction to determine custody. Washington's exercise of jurisdiction in this case both offends the goals and violates the provisions of the UCCJEA. We reverse both the trial court and the Court of Appeals and remand to the trial court with orders to dismiss.

FACTS
¶ 2 A.C. was born to Holly Cork on August 28, 1997, in Montana when Cork was 14.[1] Both A.C. and Cork were placed in foster care by a Montana court. On January 7, 1999, the district court in Montana awarded the State legal custody of both Cork and A.C. On January 27, 2000, the State of Montana petitioned for permanent custody of A.C. and for termination of Cork's parental rights. A.C. was placed with David Nagel and Anita Bangert (the Nagels) as foster parents. The trial court terminated Cork's parental rights but the Montana Supreme Court reversed the termination, concluding that due process required that Cork have an attorney during the formulation of her treatment plan. In re A.F.-C., 307 Mont. 358, 370, 37 P.3d 724 (2001). In 2002, Cork obtained her GED, completed a 75-hour nurse's aide certification, and participated in a transition program for reunification with A.C. Montana's temporary custody of A.C. was terminated, A.C. was returned to Cork's custody, and on May 15, 2002, Cork and A.C. moved to Spokane, Washington.[2]
¶ 3 In early October 2002, Washington's Child Protective Services (CPS) received an anonymous phone call from someone who claimed that A.C. had been punched and thrown around by his mother. The caller claimed that Cork had extensive involvement with Montana's social services, that she "wasn't ever interested in parenting but was interested in winning in court," and that she had received A.C. "back on a technicality" and then "fled the state of Montana." Ex. R115. Around the same time, the Nagels sent a letter to the Washington Department of Social and Health Services (DSHS) stating that A.C. had been returned to Cork "due to a legal technicality" and offering to provide "foster/adoptive care" to A.C. "should the need arise." Ex. R114.
¶ 4 DSHS began an investigative assessment of Cork. Ex. R115. A DSHS case worker contacted Cork's social worker in Montana. The social worker opined that the Nagels had called with the anonymous allegations of abuse, noting the similarities between the call and the Nagel's letter and stating, "it's too much information." Id. She said that the Nagels were vindictive when A.C. was returned to his mother. She also mentioned that Cork "is and was interested [in] parenting," and that "Holly did not flee [to Washington], she had the support of the [Montana] agency." Id. DSHS ended its investigation, finding little or no risk. The case worker concluded that although A.C. was still defiant and did not believe that Cork was his real mother, he was in no danger of abuse and should be fine with counseling. Cork did not provide A.C. with the recommended counseling.
¶ 5 On October 29, 2002, although they continued to live in Montana, the Nagels filed a petition in Spokane County for nonparental custody of A.C. The Nagels' petition claimed Cork was not a suitable custodian and requested that she have only limited visitation *691 with her son. The Washington trial court ordered Cork to allow the Nagels visitation with A.C. Later the court appointed a guardian ad litem for A.C. The Nagels then moved for a temporary order of visitation and for a bonding and attachment assessment. In August 2003, the trial court granted temporary custody of A.C. to the Nagels in Montana and set out a schedule of visitation for Cork. In October 2003, Cork obtained new counsel and in January 2004, she moved to dismiss the nonparental custody petition, arguing for the first time that Washington did not have subject matter jurisdiction[3] under the UCCJEA. The court denied the motion and at trial awarded custody of A.C. to the Nagels in Montana, with Cork having visitation rights and paying child support. Cork appealed. The Court of Appeals affirmed. In re Custody of A.C., 137 Wash. App. 245, 153 P.3d 203 (2007).

ANALYSIS
¶ 6 The UCCJEA arose out of a conference[4] of states in an attempt to deal with the problems of competing jurisdictions entering conflicting interstate child custody orders, forum shopping, and the drawn out and complex child custody legal proceedings often encountered by parties where multiple states are involved. UCCJEA prefatory note, 9 pt. 1A U.L.A. at 651; UCCJEA § 101 cmt., 9 pt. 2A U.L.A. at 657. It is, in a sense, a pact among states limiting the circumstances under which one court may modify the orders of another. See UCCJEA prefatory note, 9 pt. 1A U.L.A. at 649-51. Most states have adopted the UCCJEA in order to reduce conflicting orders regarding custody and placement of children.
¶ 7 Both Montana and Washington have adopted the UCCJEA, making the act the exclusive basis to determine jurisdiction of this interstate child custody dispute. RCW 26.27.201(2); Mont.Code Ann. § 40-7-201(2). The UCCJEA determines when one state may modify an "initial child custody determination" made by another state. RCW 26.27.201(1), .221. Under the UCCJEA, a Washington court may modify Montana's initial child custody determination only if either Montana declines jurisdiction or all parties have left that state. RCW 26.27.221.
¶ 8 The UCCJEA provides, in pertinent part:
Except as otherwise provided in RCW 26.27.231, a court of this state may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under RCW 26.27.201(1)(a) or (b) and:
(1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under RCW 26.27.211 or that a court of this state would be a more convenient forum under RCW 26.27.261; or
(2) A court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.
RCW 26.27.221.
¶ 9 In essence, the UCCJEA provides that unless all of the parties and the child no longer live in the state that made the initial determination sought to be modified, that state must first decide it does not have jurisdiction or decline jurisdiction. See id. Montana has jurisdiction over this dispute because Montana made the initial child custody determination regarding A.C.; the Nagels are persons acting as parents under the act who still reside in Montana; and Montana *692 has not declined jurisdiction. RCW 26.27.221.
¶ 10 The Nagels argue that there is no current Montana custody decree in effect so there is no initial determination to be modified. But the definitions of the UCCJEA are quite broad. The definition of "child custody determination" includes "a judgment, decree, parenting plan, or other order of the court providing for the legal custody, physical custody, or visitation with respect to a child," and includes even temporary orders. RCW 26.27.021(3). Most recently, the Montana district court dismissed the termination case and ended the State's temporary protective custody of A.C.[5] This order returned custody to Cork and, therefore, meets the definition of an initial child custody determination. The statutory definition of modification is similarly broad and includes any child custody determination that "changes, replaces, supersedes, or is otherwise made after a previous determination concerning the same child." RCW 26.27.021(11) (emphasis added). Since the trial court's action in this case occurred after Montana's prior determination concerning custody of A.C., it was a modification of Montana's initial determination.
¶ 11 The Nagels also argue that they are not persons acting as parents and thus all relevant parties have left Montana. But a "person acting as a parent" is defined as a person other than a parent who (1) had physical custody of the child for a period of six consecutive months within one year before the commencement of the proceeding and (2) claims a right to legal custody under Washington law. RCW 26.27.021(13). In the year before this action began, the Nagels had custody of A.C. from October 29, 2001 until May 15, 2002, over six months.[6] In addition, by filing a petition for nonparental custody, they have claimed a legal right to custody under Washington law. Accord S.B. v. State, 61 P.3d 6, 13 (Alaska 2002) (nonparent petitioning for custody based on detriment to child is person acting as parent under UCCJEA). The Nagels are persons acting as parents under the act.
¶ 12 The Court of Appeals concluded that Montana did not have continuing jurisdiction, but it is Montana's courts which must make this determination. RCW 26.27.221(1). Presumably responding to Cork's argument relying on federal law, the Court of Appeals concluded Montana did not have continuing jurisdiction under the federal Parental Kidnapping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A(d) and a Washington Court of Appeals case interpreting that law, In re Marriage of Murphy, 90 Wash.App. 488, 496, 952 P.2d 624 (1998). But the UCCJEA, which Washington adopted in 2001, was partially designed to end the confusion created by the interplay of the PKPA and the former uniform statute, the Uniform Child Custody Jurisdiction Act. UCCJEA prefactory note 9 pt. 1A U.L.A. at 650-51. Our conclusion rests not on the PKPA but on current controlling Washington law, which states that "a court of this state may not modify a child custody determination made by a court of another state unless ... (1) [t]he court of the other state determines it no longer has exclusive, continuing jurisdiction ... or that a court of this state would be a more convenient forum." RCW 26.27.221 (emphasis added). As Montana has also adopted this provision of the UCCJEA, under both Washington and Montana law, the Nagels must petition Montana and obtain an order that Montana has declined jurisdiction before Washington courts have jurisdiction to modify Montana's custody order.[7]
*693 ¶ 13 Finally, the Nagels contend that Cork waived any jurisdictional arguments. The Nagels cite RCW 26.27.061, which states, "A child custody determination made by a court of this state that had jurisdiction under this chapter binds all persons ... who have submitted to the jurisdiction of the court." (Emphasis added.) Because the superior court did not have jurisdiction to modify Montana's custody determination under chapter 26.27 RCW, this provision does not apply.[8]

CONCLUSION
¶ 14 Child custody cases are often disturbing. We are concerned both for parents who wish to raise their children free from interference and for the welfare of the children who are often bounced from one custodial situation to another. We regret the delay that these proceedings may have had on A.C.'s custody determination; but until Montana has divested itself of jurisdiction over A.C., issues concerning A.C.'s custody are properly for Montana, not Washington, to decide. We reverse and remand to the superior court with instructions to dismiss for want of subject matter jurisdiction consistent with this opinion. Either party may seek a brief stay in order to resolve temporary placement of A.C. while any other issues are resolved.
WE CONCUR: C. JOHNSON, MADSEN, OWENS, FAIRHURST, and STEPHENS, JJ.
J.M. JOHNSON, J. (concurring).
¶ 15 I agree with the majority that "A.C. was returned to Cork's custody" correctly by Montana (majority at 690) but would also hold that the mother's custody of her child should be confirmed by Washington. I would uphold the Washington court's jurisdiction since the family had lived in Spokane for the requisite six-month period. Since our precedent requires ordering the child returned to his mother, I would direct entry of judgment by the trial court to that effect.
¶ 16 Parents have a constitutional right to the custody, care, and control of their children. This is true under the United States Constitution and that of Washington (presumably also Montana). This right is fundamental when a court considers interference with or destruction of a family. Although emotional bonds form in temporary foster care with loving foster parents, the resulting ties must not be allowed to interfere with a parent's constitutional right to long-term custody.
¶ 17 I am concerned that the majority's opinion may prolong an already nightmarish situation since custody was improperly taken by the lower court. What is the mother to do now? After having her son returned to her years ago in Montana, then losing him by an order of a Washington court, and fighting for years through the appeal process, she may have to return to Montana and start litigation anew. I therefore concur in the result only as the majority's decision will ultimately overturn, but unfortunately not undo or even finalize, the harm caused by the lower court's judgment. I write separately to emphasize what the majority omitsthe law in Washington regarding a parent's constitutional right to the custody of their child.
¶ 18 To resolve this case, we must consider two questions: did the Washington court have jurisdiction to consider permanently taking the child and what is the correct standard in making such a decision? Though I agree with the majority's framework regarding the Uniform Child Custody and Enforcement Act, I simply cannot find in the record "`a judgment, decree, parenting plan, or other order'" of the Montana court barring Washington from having jurisdiction. Majority at 692 (quoting RCW 26.27.021(3)). The mother originally admitted below that she and A.C. had lived in Washington for the jurisdictional six months, the trial court found jurisdiction, and there is no record to the contrary. Clerk's Papers at 4, 9. This should be sufficient for jurisdiction in this case allowing a decision on the merits.
*694 ¶ 19 On the merits, the judgment to permanently take this child from his mother is contrary to established law, including core constitutional principles. "[P]arents have a fundamental right to autonomy in child-rearing decisions. The United States Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without state interference." In re Custody of Smith, 137 Wash.2d 1, 13, 969 P.2d 21 (1998), aff'd sub nom. Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). State interference with a parent's fundamental right is justified only "if the state can show that it has a compelling interest and such interference is narrowly drawn to meet [that] interest." Id. at 15, 969 P.2d 21.
¶ 20 The State's interest in interfering with a parent's fundamental right may be found compelling only in two very limited circumstances: if the parent is unfit or if placement with that parent would result in "actual detriment to the child." In re Custody of Shields, 157 Wash.2d 126, 128, 136 P.3d 117 (2006). With regard to the second circumstance, the nonparent must bear "a heightened burden to establish that actual detriment to the child's growth and development will occur if the child is placed with the parent." Id. The test is "not a balancing of all the aspects of each household and on [the child]'s wishes." Id. at 150, 136 P.3d 117.
¶ 21 The nonparent's requisite showing under this heightened standard is so "`substantial'" that a nonparent may meet that burden only in "`extraordinary circumstances.'" Id. at 145, 136 P.3d 117 (quoting In re Custody of Shields, 120 Wash.App. 108, 123, 84 P.3d 905 (2004); In re Marriage of Allen, 28 Wash.App. 637, 649, 626 P.2d 16 (1981)). There are only a few cases illustrating the exception to the general constitutionally based rule of respect for family integrity. Id.; see, e.g., Allen, 28 Wash.App. at 649, 626 P.2d 16 (actual detriment was established when child was deaf and stepmother knew sign language but natural father would not learn so as to communicate more fully with the child); In re Custody of R.R.B., 108 Wash.App. 602, 31 P.3d 1212 (2001) (actual detriment was established when child was bipolar and suicidal and natural parents could not provide the needed therapy and stability); In re Custody of Stell, 56 Wash. App. 356, 783 P.2d 615 (1989) (actual detriment was established when child had been physically and sexually abused, and the natural parent could not provide the needed therapy and stability). The more common application of this rule from our jurisprudence is illustrated in In re Custody of Anderson, 77 Wash.App. 261, 890 P.2d 525 (1995) (actual detriment was not established where nonparents offered a superior home environment).
¶ 22 An early case in this court still correctly states the law: "that [a child] might be better educated, and better clothed, and have a more pleasant home with some one else than the parent can have no weight with the court as against the natural rights of the parent." In re Neff, 20 Wash. 652, 655, 56 P. 383 (1899).
¶ 23 Although A.C. occasionally displayed troubling behaviors and emotions, which might have resulted from foster parent pressures, the extraordinary circumstances required to deprive a fit mother of the right to parent her child are clearly not met. It is worthy of note that the child's problems were exacerbated after the Nagels' visits resumed frequency.
¶ 24 "[T]here is a presumption that fit parents act in the best interests of their children." Troxel, 530 U.S. at 68, 120 S.Ct. 2054. Both the Washington and Montana social services agencies agreed the mother should retain her child. She provided a clean and comfortable home, enrolled him in school, went to parent-teacher conferences, and even visited his school classes (as too few parents do today).
¶ 25 The mother voluntarily allowed the Nagels monthly visitation after she moved to Spokane but decided to stop these visits when they caused problems for A.C. This court has held, and the United States Supreme Court has affirmed, that "[p]arents have a right to limit visitation of their children with third persons." Smith, 137 Wash.2d at 21, 969 P.2d 21. The mother had the right to restrict the Nagels' visitation. A.C. did well his first semester at school when he had no contact with the Nagels. *695 After the Nagels resumed visitation, behavioral problems began to emerge.
¶ 26 "[T]he paramount goal of child welfare legislation is to reunite the child with his or her legal parents, if reasonably possible." In re Dependency of J.H., 117 Wash.2d 460, 476, 815 P.2d 1380 (1991). Although strong emotional bonds might form in foster care, "[t]he nature of the foster care relationship is distinctly different from that of the natural family; namely, it is a temporary arrangement created by state and contractual agreements." Renfro v. Cuyahoga County Dep't of Human Services, 884 F.2d 943, 944 (6th Cir.1989).
¶ 27 The Nagels admit here that if their "basis for custody was that they had a better bond with [A.C.] than [Holly], they would clearly have no basis for custody." Resp'ts' Suppl. Br. at 22-23. But this is the basis of their claim.
¶ 28 The trial court expressly would not find the mother to be an unfit mother. Although I commend the Nagels for their service as foster parents and their care of A.C., foster parents must not use their bond with a child to take custody from a child's fit natural parent.

CONCLUSION
¶ 29 This young boy's life is already a long story, far too many chapters in litigation. I recognize the burden this has placed on the mother, the Nagels, and especially on A.C. Judicial delay and error has resulted in A.C. moving between homes, after living with foster parents for years. Taking A.C. from his mother and adding insult to injury by ordering her to pay child support is simply unacceptable.[1] I fear the majority's decision may allow further litigation in Montana and A.C.'s future will not be finally resolved for some time. As any parent can attest, time lost with your child is something you can never get back. The constitution and laws require that A.C. be immediately returned to his natural mother. Since that result may be delayed under the majority, I only concur.
WE CONCUR: ALEXANDER, C.J., and SANDERS, J.
NOTES
[1] A.C.'s father is deceased.
[2] A.C. had resided in Washington for less than six months at the time this case was filed on October 29, 2002, and as such Washington could not have been considered A.C.'s "home state" under the UCCJEA. See RCW 26.27.021(7). However, such a determination is unnecessary for us to reach our holding.
[3] The UCCJEA uses the term "subject matter jurisdiction," and for consistency we use the statutory language. However, Washington courts did, in fact, have subject matter jurisdiction over the parties and the issues. See CONST. art. IV, § 6 (describing general jurisdiction of superior courts); Dougherty v. Dep't of Labor & Indus., 150 Wash.2d 310, 316-17, 76 P.3d 1183 (2003) (subject matter jurisdiction concerns the type of controversy, not the facts of an individual case). The statute might have more accurately used the term "exclusive venue" instead of "subject matter jurisdiction."
[4] The National Conference of Commissioners on Uniform State Laws is made up of lawyers, judges, legislators, and law school professors appointed by each state. 9 U.L.A. III (1999). The conference works through standing and special committees that draft and consider proposed uniform legislation. Id.
[5] Contrary to the suggestion by the concurrence, we express no opinion regarding the merits of the decision of the Montana Supreme Court to return A.C. to Cork's custody.
[6] The Nagels do not dispute that they had physical custody of A.C. for six consecutive months prior to the commencement of these proceedings. Resp'ts' Suppl. Br. at 6.
[7] The comment to the UCCJEA also states that a party seeking to modify a custody determination must obtain an order from the original state stating that it no longer has jurisdiction. UCCJEA § 202 cmt., 9 pt. 1A U.L.A. at 674. Even when the original state continues to have jurisdiction, it may decline to exercise that jurisdiction if it determines that another state is a more convenient forum and in a better position to make a custody determination. RCW 26.27.261; UCCJEA § 207 cmt., 9 pt. 1A U.L.A. at 683. A court that declines jurisdiction under section 207 should do so only after considering all relevant factors. Id.
[8] We also note that to permit waiver of the jurisdictional provisions of the UCCJEA would undermine the goals of avoiding conflicting proceedings. Cf. UCCJEA § 201 cmt., 9 pt. 1A U.L.A. at 673 (an agreement to confer jurisdiction under the UCCJEA statute is not effective).
[1] The trial court ordered the mother to pay child support to the foster parents. I assume the majority will dissolve this requirement as well.