Filed 8/11/20

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re J.W. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.S. et al., Defendants and Appellants. | E074079 (Super.Ct.Nos. J-268832 & J-268833) OPINION |

APPEAL from the Superior Court of San Bernardino County. Christopher B. Marshall, Judge. Affirmed.

Suzanne M. Davidson, under appointment by the Court of Appeal, for Defendant and Appellant A.W.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant D.S.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.

Michelle D. Blakemore, County Counsel, Michael A. Markel, Principal Assistant County Counsel, Jamila Bayati and David R. Guardado, Deputy County Counsel for Plaintiff and Respondent.

In this appeal, we conclude that the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Fam. Code, § 3400 et seq.), which governs which state is to entertain a dependency case, is a mandatory rule, but nevertheless does not regulate a California trial court's fundamental jurisdiction.[1] For this reason, it can be forfeited by a failure to raise the issue in juvenile court, as was the case here.

## I. FACTUAL AND PROCEDURAL HISTORY

This juvenile dependency appeal follows the termination of parental rights over two half-sisters. A.W., the father of only the younger daughter, contends that the juvenile court failed to comply with the UCCJEA, such that Louisiana should have been the forum for the case. In addition, D.S. (Mother), the mother of both children, contends that the juvenile court failed to comply with the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.), which pertains to dependency proceedings involving children who may be Indian.[2]

The case began when, in December 2016, plaintiff and respondent San Bernardino Children and Family Services (CFS) learned that Mother had threatened to physically

---

[1] Undesignated statutory references are to the Family Code.

[2] Because ICWA uses the term "Indian," we do the same for consistency, even though we recognize that other terms, such as "Native American" or "indigenous," are preferred by many.

abuse J.W., the younger daughter, then one year old. Mother had called 911 and threatened to stab herself and J.W. Police officers detained Mother and temporarily committed her pursuant to Welfare and Institutions Code section 5150.

CFS's detention reports stated that, just a few weeks prior, Mother had moved to California from Louisiana, where she had been living with A.W. (A later psychological evaluation specified that Mother had moved from Louisiana earlier that same month, December 2016.) According to a family friend, Mother was spiraling into depression in Louisiana and had mentioned relinquishing her children to the Louisiana Department of Children and Family Services. The family friend accordingly urged Mother to come live with her in California, which she did. The family friend also informed CFS that in 2010 Mother had suffered traumatic brain injuries requiring dozens of surgeries, from a car accident that killed Mother's mother and sister. Since the accident, Mother had suffered from grand mal seizures and had been diagnosed with schizophrenia.

CFS filed Welfare and Institutions Code section 300 petitions for J.W. and her older, nine-year-old sister L.M. Both petitions alleged failure to protect the child pursuant to Welfare and Institutions Code section 300, subdivision (b)(1), and L.M.'s petition also alleged that the child had been left without any provision for support pursuant to Welfare and Institutions Code section 300, subdivision (g). At the December 27, 2016, detention hearing, the juvenile court found a prima facie case and detained the children. Although the detention reports noted Mother's recent move from Louisiana,

CFS did not address whether there was jurisdiction under the UCCJEA, and the juvenile court made no finding concerning the UCCJEA.

At a combined jurisdictional and dispositional hearing in February 2017, the juvenile court found the allegations in both petitions true and ordered family reunification services for Mother and A.W.  The juvenile court found it was not in L.M.'s best interest for family reunification services to be offered to her father D.M.  The juvenile court found that ICWA did not apply.  CFS's jurisdictional/dispositional report again did not raise, and the juvenile court did not address, UCCJEA jurisdiction.  Similarly, UCCJEA jurisdiction was not raised or addressed when A.W. made his first appearance at the 12-month review hearing in February 2018.

Because Mother and A.W. challenge only ICWA and UCCJEA deficiencies, we need not describe in detail the parents' subsequent progress.  Family reunification services were terminated at the 18-month review hearing and parental rights were later terminated at a November 2019 Welfare and Institutions Code section 366.26 hearing.

## II.  ICWA

A.  *Additional Background*

Counsel for L.M.'s father D.M. (who is not a party to this appeal) stated at a June 2018 hearing that D.M. might have Indian ancestry on his mother's side.  D.M. submitted forms indicating he may have Indian ancestry but did not know which tribes in particular.  At the hearing, the juvenile court asked the social worker "to follow up with [D.M.'s]

4

mother" to attempt to identify tribes and ordered D.M. "to keep the social worker advised of any information relating to possible Indian ancestry" he may obtain.

The following month, CFS informed the juvenile court the following: "'[D.M.] stated he does not have any ICWA. He stated that he had heard from family members that the family did have ICWA and [D.M.] was informed that was not accurate. He regretted telling the Court that he had ICWA stating, [']Saying I had ICWA has caused me too many problems'." At a hearing a few days later, CFS confirmed that D.M. "really has no knowledge of any Indian ancestry at present."

Two months later, D.M. submitted a form ICWA-020 (Parental Notification of Indian Status), checking the box next to the statement "I have no Indian ancestry as far as I know." At the 18-month review hearing that same month, D.M. had the following exchange with the juvenile court:

"THE COURT: Now, as to [D.M.] —all right. I understand with respect to [D.M.], that he is uncertain as to Native American ancestry; is that correct?

"[D.M.]: Yes.

"THE COURT: So you're not aware of a specific tribe?

"[D.M.]: No. I mean—I'm sorry. Basically, I'm not sure. [¶] I don't think I have Indian in me at all. [¶] . . . [¶]

"[THE COURT]: So, [D.M.], what I want to be clear on, however, is that I saw a statement that the social worker quoted you saying, 'Gee, I just raised all sorts of problems by saying, "I may have Native Indian ancestry.["] So I shouldn't have done

5

that,' in essence.  [¶]  So what I don't want to have happen is that you're indicating, 'Yeah, there probably is and I'— 'but, you know it causes too much of a hassle, so let's just stop it.'  And I don't want that to be your response.  And here's why, because if you can tell me today as you sit here that it is an accurate statement that you have no Indian ancestry as far as [you] know—

"[D.M.]:  Yeah.

"THE COURT:—we're good to go.  [¶]  But if you have information, if you have an understanding from family or otherwise that you may have Indian ancestry—

"[D.M.]:  As far as I know, I don't.

"THE COURT:  And do you have any family members present today?

"[D.M.]:  No.

"THE COURT:  All right.  So, again, that's an accurate statement, 'I have no Indian ancestry as far as I know.'

"[D.M.]:  Correct.

"THE COURT:  You have to answer verbally.

"[D.M.]:  Yes, sir.

"THE COURT:  All right.  Then, the Court will go ahead and accept the notification of Indian status. And we will file it as of today's date."

B.  *Analysis*

Mother contends that CFS did not satisfy its duty of inquiry with regard to D.M. We disagree.

6

"Juvenile courts and child protective agencies have 'an affirmative and continuing duty to inquire' whether a child for whom a [Welfare and Institutions Code] section 300 petition has been filed is or may be an Indian child." (*In re N.G.* (2018) 27 Cal.App.5th 474, 481.) "If the court or social worker 'knows or has reason to know' the child is or may be an Indian child, the social worker 'is required to make further inquiry regarding the possible Indian status of the child, and to do so as soon as practicable, by interviewing the parents, Indian custodian, and extended family members' and 'any other person that reasonably can be expected to have information regarding the child's membership status or eligibility.'" (*Ibid.*)

Here, the record does not show that CFS ever interviewed D.M.'s mother regarding Indian ancestry despite being told to do so by the juvenile court. However, CFS no longer needed to interview D.M.'s mother after D.M. stated that his understanding that his family might have Indian ancestry was not accurate. (See *In re C.A.* (2018) 24 Cal.App.5th 511, 519 [duty of inquiry satisfied where a parent "initially indicate[s] that he may have had Native American heritage [but later] explain[s] that he had learned new information about his parents and did not have any Native American heritage"].) Moreover, the fact that D.M. "regretted" telling the juvenile court that ICWA might apply does not mean that CFS and the court were no longer entitled to rely on D.M.'s repeated representations. "ICWA does not obligate the court or [child protective agencies] 'to cast about' for investigative leads." (*In re A.M.* (2020) 47 Cal.App.5th 303, 323.) Here, the duty of inquiry was satisfied when D.M. stated that as

7

far as he knew he had no Indian ancestry, and when in response to the juvenile court's questioning, D.M. stated that his changed response was not due to any "hassle" ICWA may have caused.

### III. The UCCJEA

#### A. *Additional Background*

In approximately 2014, Mother moved with her daughter L.M. from California, where they had lived for two years, to Louisiana. Mother lived in Louisiana for another two years, and J.W. was born in Louisiana during that time. As far as the record reveals, Mother has been living in California since the petitions were filed in December 2016.

In the detention report, CFS stated that it spoke with A.W., who stated he was living in Louisiana. A.W. was also listed as having a Louisiana address in the jurisdictional/dispositional report and the six-month review report, but at some point before the 12-month review report was filed, A.W. had moved to California into an apartment he shared with Mother. A.W. has provided California addresses since then.

#### B. *Analysis*

The UCCJEA is a model law that "arose out of a conference of states in an attempt to deal with the problems of competing jurisdictions entering conflicting interstate child custody orders, forum shopping, and the drawn out and complex child custody legal proceedings often encountered by parties where multiple states are involved." (*In re Custody of A.C.* (Wash. 2009) 165 Wn.2d 568, 574, fn. omitted; see also *In re Gloria A.* (2013) 213 Cal.App.4th 476, 482 [purpose of the UCCJEA is to "avoid jurisdictional

8

competition between states or countries, promote interstate cooperation, avoid relitigation of another state's or country's custody decisions and facilitate enforcement of another state's or country's custody decrees"].) To date, every state except Massachusetts has enacted the UCCJEA, and the District of Columbia and the United States Virgin Islands have enacted it as well. (See National Conference of Commissioners on Uniform State Laws, Uniform Child Custody Jurisdiction and Enforcement Act (1997), Editors' Notes.) California adopted the UCCJEA effective January 1, 2000, and it is codified in section 3400 et seq. (See *In re C.T.* (2002) 100 Cal.App.4th 101, 106.)[3]

"The UCCJEA is the exclusive method in California to determine the proper forum in child custody proceedings involving other jurisdictions." (*In re Jaheim B.* (2008) 169 Cal.App.4th 1343, 1348; see also § 3421, subd. (b) [§ 3421, subd. (a) "is the exclusive jurisdictional basis for making a child custody determination by a court of this state"].) "A dependency action is a '"child custody proceeding"' subject to the UCCJEA." (*In re Jaheim B.*, *supra*, 169 Cal.App.4th at p. 1348.) "[A]s with any statute, interpretation of the UCCJEA is a question of law we review de novo." (*Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1287.)

A.W. contends for the first time on appeal that the juvenile court lacked jurisdiction under the UCCJEA and that, as a result, all findings and orders made by the juvenile court as to J.W. must be reversed. We decline to address this contention on the

---

[3] When we use the term UCCJEA, we refer to either the law as enacted in California, the model law, or the law as enacted in another state, depending on the context.

9

merits. Instead, we hold that, even assuming the juvenile court lacked UCCJEA jurisdiction, A.W. has forfeited the ability to raise the argument here. Forfeiture would not apply if the UCCJEA provisions governing jurisdiction implicated the courts' fundamental jurisdiction, but, as we explain, they do not.[4]

### 1. Kabran *and Fundamental Jurisdiction*

In *Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330 (*Kabran*), our Supreme Court emphasized the difference between a court's fundamental jurisdiction and the mandatory jurisdictional rules that the court must apply. The court explained that the label "jurisdiction" has multiple meanings: "'"When courts use the phrase 'lack of jurisdiction,' they are usually referring to one of two different concepts, although . . . the distinction between them is 'hazy.'" [Citation.]' [Citation.] A lack of fundamental jurisdiction is "'""an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' [Citation.] . . . " [¶] "[F]undamental jurisdiction cannot be conferred by waiver, estoppel, or consent. Rather, an act beyond a court's jurisdiction in the fundamental sense is null and void" *ab initio*. [Citation.] "Therefore, a claim based on a lack of . . . fundamental jurisdiction[] *may be raised for the first time on appeal*. [Citation.]"' [Citation.] Likewise, 'a collateral attack on a final

---

[4] Our reasoning here differs from the forfeiture argument asserted by CFS in its brief. The case CFS focuses on, *In re A.C.* (2017) 13 Cal.App.5th 661, applied forfeiture to a "procedural error"—specifically, a purported failure to authenticate e-mails. (See *id.* at pp. 671-672.) We would not label the juvenile court's failure to address UCCJEA jurisdiction at all here a mere procedural error. As noted above, the detention reports stated that Mother had recently moved to California from Louisiana, yet UCCJEA jurisdiction was never raised by the parties nor expressly determined by the court.

judgment may be made at any time when the judgment under challenge is *void* because of an absence of "fundamental jurisdiction."'"" (*Id*. at p. 339.)

Apart from distinguishing rules by whether they implicate fundamental jurisdiction, "[i]n interpreting statutory requirements, courts have also used the terms 'mandatory' and 'directory.'  Whether a requirement is mandatory or directory is determined largely by its effect:  'If the failure to comply with a particular procedural step does not invalidate the action ultimately taken, . . . the procedural requirement is referred to as "directory."  If, on the other hand, it is concluded that noncompliance does invalidate subsequent action, the requirement is deemed "mandatory."'" (*Kabran*, *supra*, 2 Cal.5th at p. 340.)

The fact that a jurisdiction requirement is mandatory, however, does not mean that it implicates fundamental jurisdiction.  *Kabran* held that "a party's failure to comply with a mandatory requirement 'does not necessarily mean a court loses *fundamental* jurisdiction resulting in "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties."'  [Citation.]  It is a 'misuse of the term "jurisdictional" . . . to treat it as synonymous with "mandatory"' as a general matter.  [Citation.]  'There are many time provisions, e.g., in procedural rules, that are not directory but mandatory; these are binding, and parties must comply with them to avoid a default or other penalty.  But failure to comply does not render the proceeding void' in a fundamental sense.  [Citations.]  The [United States Supreme Court] has similarly

11

recognized, as a matter of federal law, that 'mandatory' rules should not always 'be given the jurisdictional brand.'"  (*Kabran*, *supra*, 2 Cal.5th at p. 341.)

Thus, as *Kabran* summarized, "jurisdictional rules are mandatory, but mandatory rules are not necessarily jurisdictional.  Noncompliance with a mandatory rule can result in invalidation of the action so long as the noncompliance is properly raised; a party can forfeit its challenge to the noncompliance by failing to object.  Noncompliance with a jurisdictional rule cannot be excused or forfeited; a party may assert such noncompliance for the first time on appeal or in a collateral attack as a ground for invalidating the action."  (*Kabran*, *supra*, 2 Cal.5th at p. 342.)

"'There is "'"no simple, mechanical test"'"'" for determining whether a specific requirement is jurisdictional or not, but "[t]he question is ultimately one of legislative intent."  (*Kabran*, *supra*, 2 Cal.5th at p. 343; see also *Garrison v. Rourke* (1948) 32 Cal.2d 430, 435 [courts' vested jurisdiction "may not lightly be deemed to have been destroyed"], overruled on another ground in *Keane v. Smith* (1971) 4 Cal.3d 932, 939.)

In then applying this framework, *Kabran* held that a provision in the Code of Civil Procedure did not implicate fundamental jurisdiction and that, as a result, a party was precluded from raising a violation of it for the first time on appeal.  (*Kabran*, *supra*, 2 Cal.5th at p. 334.)  As *Kabran* made clear, the only rules not subject to forfeiture are those conferring fundamental jurisdiction.

## 2. *The UCCJEA and Fundamental Jurisdiction*

It is clear enough that the rules governing jurisdiction in the UCCJEA are mandatory. Given that the main goals of the UCCJEA include "avoid[ing] jurisdictional competition [and] relitigation of another state's or country's custody decisions" (*In re Gloria A.*, *supra*, 213 Cal.App.4th at p. 482), ensuring that only one state exercise jurisdiction at a time outside of emergencies is a crucial part of how the UCCJEA is supposed to function. (See §§ 3421, 3424; *City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 924 ["Invariably, 'courts look to the procedure's purpose or function. If the procedure is essential to promote the statutory design, it is "mandatory" and noncompliance has an invalidating effect.'"]; see also *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 87.)

However, although the jurisdictional rules of the UCCJEA are mandatory, we are not persuaded that the Legislature intended them to be used in California in a manner that implicates a court's fundamental jurisdiction. In this state, fundamental jurisdiction over juvenile dependency cases such as this is governed by Welfare and Institutions Code section 300, which states that a child described by that section "is within the jurisdiction of the juvenile court." (See, e.g., *In re Z.S.* (2015) 235 Cal.App.4th 754, 770; *San Joaquin County Human Services Agency v. Marcus W.* (2010) 185 Cal.App.4th 182, 192; *In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1410; see also *Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 808 ["California's superior courts are courts of general jurisdiction, which means they are generally empowered to resolve the

legal disputes that are brought to them."]; Cal. Const., art. VI, § 10 [outside of mandamus, certiorari, prohibition, and habeas corpus proceedings, "[s]uperior courts have original jurisdiction in all . . . causes"].)  Once a petition under Welfare and Institutions Code section 300 is filed, the juvenile court is then ordinarily empowered to evaluate the allegations contained in the petition and declare the minor a dependent of the court.

The UCCJEA, on the other hand, embodies an agreement among states on rules to determine which jurisdiction should provide the proper forum.  (See *In re Custody of A.C.*, *supra*, 165 Wn.2d at p. 574 [UCCJEA "arose out of a conference of states"]; cf. *Alexander v. Superior Court* (2003) 114 Cal.App.4th 723, 727 ["a forum selection clause usually chooses a court from among different states or nations"].)  Because it is a mandatory rule, a court errs when it does not satisfy the requirements of the UCCJEA, and a preserved error can lead to reversal.  (See *Kabran*, *supra*, 2 Cal.5th at p. 341; *People v. Lara* (2010) 48 Cal.4th 216, 228 [noting that mandatory rules are not subject to "good cause" exceptions].)  But where, as here, the UCCJEA is not raised in the juvenile court, it can be forfeited just like other important, mandatory rules.  (See *Kabran*, at p. 334.)

Another case from our Supreme Court offers a compelling analogy to our reasoning.  In *County of San Diego v. State of California*, *supra*, 15 Cal.4th, 68, 85-90 (*County of San Diego*), the court considered the effect of violating statutory procedures enacted to determine through a "test claim" which forum was to apply section 6 of article

14

XIII B of the California Constitution (section 6) to a matter. Like the UCCJEA, these procedures sought to eliminate the problem of multiple and conflicting proceedings in different courts, although within California. Generally, section 6 requires that "the state reimburse local governments for costs incurred when the state enlists their assistance in implementing a state program." (*County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 207.) *County of San Diego* explained that "'the Legislature enacted comprehensive administrative procedures for resolution of claims arising out of section 6 . . . because the absence of a uniform procedure had resulted in inconsistent rulings on the existence of state mandates, unnecessary litigation, reimbursement delays, and, apparently, resultant uncertainties in accommodating reimbursement requirements in the budgetary process.'" (*County of San Diego*, *supra*, 15 Cal.4th at p. 86.) Specifically, the Legislature "'establishe[d] a test-claim procedure to expeditiously resolve disputes affecting multiple agencies'" "'for the express purpose of avoiding multiple proceedings . . . addressing the same claim that a reimbursable state mandate has been created.'" (*Ibid.*)

Although it did not use the term, *County of San Diego* effectively determined that the rule against multiple proceedings was mandatory, as "[a] contrary conclusion would undermine one of 'the express purpose[s]' of the statutory procedure: to 'avoid[] multiple proceedings . . . addressing the same claim that a reimbursable state mandate has been created.'" (*County of San Diego*, *supra*, 15th Cal.4th at p. 87; see *City of Monica v. Gonzalez*, *supra*, 43 Cal.4th at p. 924 ["'If the procedure is essential to promote the

15

statutory design, it is 'mandatory' and noncompliance has an invalidating effect.'"].)  It therefore held that the trial court "should not have proceeded to resolve San Diego's claim for reimbursement under section 6 while the [earlier] Los Angeles action was pending."  (*County of San Diego*, *supra*, at p. 87.)

However, the court rejected the "assertion that the error was jurisdictional." (*County of San Diego*, *supra*, 15 Cal.4th at p. 87.)  Citing the rule that vested jurisdiction "'may not lightly be deemed to have been destroyed'" and "find[ing] no statutory provision that either 'expressly provide[s]' [citation] or otherwise 'clearly indicate[s] [citation] that the Legislature intended to divest all courts other than the court hearing the test claim" of fundamental jurisdiction, *County of San Diego* held that the trial court's "erroneous refusal to stay further proceedings [did] not render those further proceedings void" for lack of fundamental jurisdiction.  (*Id.* at pp. 87-88.)

*County of San Diego* thus concluded in effect that the test claim procedure, which sought to prevent "unnecessary" and "multiple" proceedings, "inconsistent rulings," and "delays" of relief, was a mandatory rule, but not one implicating fundamental jurisdiction.  (*County of San Diego*, *supra*, 15 Cal.4th. at pp. 86-87; see also *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 119-122 [although "prime purpose" of a "mandatory venue provision" was to "protect absent defendants from default judgments obtained in improper counties," provision accomplishes its purpose "not by rendering void all judgments obtained in improper counties, but by placing an independent responsibility on the trial court to scrutinize all complaints, even when no change of

16

venue motion is filed"]; *People ex rel. Garamendi v. American Autoplan, Inc.* (1993) 20 Cal.App.4th 760, 770, 772 [the "rule of exclusive concurrent jurisdiction," which is "'based upon the public policies of avoiding conflicts that might arise between courts if they were free to make contradictory decisions or awards relating to the same controversy, and preventing vexatious litigation and multiplicity of suits,'" is "not 'jurisdictional' in the sense that failure to comply renders subsequent proceedings void"], cited in *County of San Diego*, at p. 88.)

It is conceivable that in some context, the Legislature could intend that a forum selection statute create fundamental jurisdiction, unlike in *County of San Diego*. But we do not think that this could be so in the juvenile dependency context at issue here. In dependency law, our Legislature has placed a particular emphasis on the need to make orders terminating parental rights final. This leads us to conclude that, as with the forum selection statutes in *County of San Diego*, the Legislature did not intend to make UCCJEA jurisdiction a matter of fundamental jurisdiction on top of the fundamental jurisdiction established by Welfare and Institutions Code section 300 in standard dependency cases. Specifically, Welfare and Institutions Code section 366.26, subdivision (i) prohibits virtually all collateral attacks on termination orders, evincing a clear intent to restrict their review. But equating UCCJEA jurisdiction with fundamental jurisdiction would constitute a wide exception to the finality afforded by this provision, as a meritorious claim of UCCJEA error could undo a termination order despite the failure to raise the issue in juvenile court.

17

Welfare and Institutions Code section 366.26, subdivision (i)(1) states: "Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the child, upon the parent or parents and, upon all other persons who have been served with citation by publication or otherwise as provided in this chapter. After making the order, the juvenile court *shall have no power to set aside, change, or modify it*, except as provided in paragraph (2), but nothing in this section shall be construed to limit the right to appeal the order." (Italics added.) Paragraph (2) provides a narrow exception for tribal customary adoptions, not applicable here.

By operation of its express terms, Welfare and Institutions Code section 366.26, subdivision (i) prohibits virtually all collateral attacks on orders terminating parental rights. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413 ["the Legislature has . . . expressly provided that the final order terminating parental rights and freeing the child for adoption itself cannot be collaterally attacked in the trial court"]; *In re Z.S.* (2015) 235 Cal.App.4th 754, 770 ["Collateral attack of a termination order is expressly prohibited in [Welf. & Inst. Code] § 366.26, subd. (i)(1)"]; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1161 [Welf. & Inst. Code §366.26, subd. (i)(1) "forbids alteration or revocation of an order terminating parental rights except by means of a direct appeal from the order"].) Moreover, the provision has been applied strictly: for example, it has been used to find modifications of termination orders void where the modifications sought to cure purported ICWA violations. (*In re K.M.* (2015) 242 Cal.App.4th 450, 457-458; see also

*David B. v. Superior Court* (1994) 21 Cal.App.4th 1010, 1018 [construing former Welfare and Institutions Code section 366.26, subd. (h)].)

The Legislature has restricted collateral attacks on termination orders because both the state and the child have exceptionally strong interests in making sure the matter is determined conclusively. As the United States Supreme Court has emphasized, "[t]he State's interest in finality is unusually strong in child-custody disputes," and "[t]here is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." (*Lehman v. Lycoming County Children's Services Agency* (1982) 458 U.S. 502, 513-514.) Our Supreme Court has stressed the importance of finality in the dependency context as well, noting that in such matters the state's "interest in expeditiousness is strong indeed," but that "[i]ts interest in finality is stronger still." (*In re Sade C.* (1996) 13 Cal.4th 952, 993; see also *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["Because [dependency] proceedings involve the well-being of children, considerations such as permanency and stability are of paramount importance."]; *In re Jerred H.* (2004) 121 Cal.App.4th 793, 799 ["our Supreme Court has emphatically recognized" the importance of the "finality" of a termination order]; *In re Cody B.* (2007) 153 Cal.App.4th 1004, 1011 [noting "public policy in preserving the finality of termination judgments"].)

A finding that a termination order entered without UCCJEA jurisdiction was "'"null and void" *ab initio*'" (*Kabran*, *supra*, 2 Cal.5th at p. 339) would core these public

19

policy considerations. Years, perhaps a decade or more, after parental rights are terminated and a child has been adopted, an aggrieved party could contend that the adoption and termination orders must be reversed because, for instance, the child did not actually live in this state in the six months before the dependency petition was filed. (See §§ 3421, subd. (a)(1), 3402, subd. (g).) If the contention were meritorious, then the child's home and the identity of the legal parents would change at least once more, no doubt significantly disrupting the child's life. And even if the contention eventually failed, the child would still have suffered "prolonged" "uncertainty" regarding his or her home status. (See *Lehman v. Lycoming County Children's Services Agency*, *supra*, 458 U.S. at pp. 513-514.) The risk attendant to such uncertainty is possibly why Welfare and Institutions Code section 366.26, subdivision (i) limits collateral attacks to narrow situations involving tribal customary adoptions. But in any event, we do not believe the Legislature intended to subject the finality of termination orders to such a gaping exception when it enacted the UCCJEA, or that the model UCCJEA was even intended to regulate the fundamental jurisdiction of the courts of states that adopted it.

If jurisdiction under the UCCJEA equated to fundamental jurisdiction, whether a juvenile court's error in deciding jurisdiction was harmless would be irrelevant. Any judgment made by a court lacking fundamental jurisdiction must be reversed, regardless of harm. (See *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 199, fn. 10 [rejecting notion that lack of fundamental jurisdiction can be cured by harmless error analysis].) The absence of any indication of harm here, however, underscores why the

20

Legislature likely did not intend California's UCCJEA to govern fundamental jurisdiction.

The record indicates that Louisiana rather than California likely had UCCJEA jurisdiction over J.W., as the record indicates J.W. was born there in 2015 and moved in December 2016 while A.W. remained in Louisiana. (See § 3421, subd. (a)(1); La. Stat. Ann. § 13:1813(A)(1).) However, despite the fact that A.W. was given a full and fair opportunity to participate in the proceedings below, there has been no attempt to demonstrate that J.W. was ever the subject of any custody order in Louisiana, that Louisiana has any open dependency cases involving her, or that the state has any other specific reason to keep an eye on her well-being or whereabouts. At most, there are passing references of Mother, before moving to California, stating an intent to surrender her daughters to the Louisiana Department of Children and Family Services, but this does not show that Louisiana was ever involved with protecting J.W.'s welfare. Moreover, during the pendency of the proceedings below, A.W. moved from Louisiana to join Mother in California and, like Mother and J.W., has stayed here since. Circumstances such as these—multi-year California residence for all involved, a full and fair opportunity to raise UCCJEA jurisdiction, and zero evidence of a conflicting proceeding— demonstrate why the Legislature would not have intended to allow the possible invalidation of Mother's or J.W.'s termination orders, whether now or years into the future, based on an argument that J.W. used to live in Louisiana. (See also *Barquis v. Merchants Collection Assn.*, *supra*, 7 Cal.3d at p. 120, fn. 25 [mandatory venue provision

21

had no "constitutional infirmities" rendering judgments obtained in violation of provision void where plaintiffs received "notice of the full amount sought in the collection agency's action"]; *Stearns v. Los Angeles City School Dist.* (1966) 244 Cal.App.2d 696, 718 [questioning "whether any purpose would be served by reversing the judgment entered in this case and remanding the case so that the litigation can proceed in an orderly manner with priority in the [earlier] Los Angeles County action," because "[i]f there are no errors in this record, and the evidence compels the result which has been obtained, such a reversal would appear frivolous"], cited in *County of San Diego*, *supra*, 15 Cal.4th at pp. 88-89.)

   3.  *The UCCJEA and Subject Matter Jurisdiction*

   In deciding this case, we do not write on a blank slate, and we acknowledge that there are reasons why one might contend the UCCJEA should be read as governing fundamental jurisdiction.  For one, section 3421, subdivision (b) uses the word "jurisdictional" in stating that the procedures described in section 3421, subdivision (a) provide the "exclusive jurisdictional basis for making a child custody determination by a court of this state."  For another, although neither the provisions of California's UCCJEA nor the model UCCJEA use the term, a comment to the model UCCJEA uses the phrase "subject matter jurisdiction," which is often equated with fundamental jurisdiction.  (See 9 pt. 1A West's U. Laws Ann. (1999) U. Child–Custody Jurisdiction and Enforcement Act, com. foll. § 201, p. __ ["since jurisdiction to make a child custody determination is subject matter jurisdiction, an agreement of the parties to confer jurisdiction on a court

22

that would not otherwise have jurisdiction under this [a]ct is ineffective"]; *Quigley v. Garden Valley Fire Protection Dist.*, *supra*, 7 Cal.5th at p. 808 [using the terms "fundamental jurisdiction" and "subject matter jurisdiction" interchangeably]; *In re Harris* (1993) 5 Cal.4th 813, 836-837 [same].)

Moreover, courts in this state and others have equated UCCJEA jurisdiction with subject matter jurisdiction. (See, e.g., *In re Aiden L.*, *supra*, 16 Cal.App.5th at p. 516; *In re R.L.*, *supra*, 4 Cal.App.5th at p. 136; *Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1316-1317 (*Brewer*); *In re Gloria A.*, *supra*, 213 Cal.App.4th at p. 481; *In re Jaheim B.*, *supra*, 169 Cal.App.4th at p. 1348; *H.T. v. Cleburne County Dept. of Human Resources* (Ala. Civ. App. 2014) 163 So.3d 1054, 1061; *Stauffer v. Temperle* (Iowa Ct. App. 2010) 794 N.W.2d 317, 321; *Officer v. Blankenship* (Ky. Ct. App. 2018) 555 S.W.3d 449; *Schroeder v. Schroeder* (Minn. Ct. App. 2003) 658 N.W.2d 909; *Friedman v. Eighth Judicial Dist. Court of State, ex rel. County of Clark* (Nev. 2011) 127 Nev. 842; *In re Guardianship of K.B.*, *supra*, 2019 N.H. LEXIS 218; *Gharachorloo v. Akhavan* (N.Y. App. Div. 2009) 67 A.D.3d 1013; *Harshberger v. Harshberger* (N.D. 2006) 724 N.W.2d 148; *Rosen v. Celebrezze* (Ohio 2008) 883 N.E.2d 420 (per curiam); *Rosen v. Rosen* (W.Va. 2008) 222 W.Va. 402; *Harignordoquy v. Barlow* (Wyo. 2013) 313 P.3d 1265.) Looked at loosely, these items suggest we should construe the UCCJEA as governing fundamental jurisdiction, particularly if an analysis of the case law implicated section 3461, which provides that "[i]n applying and construing [the UCCJEA], consideration

23

shall be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it.”

However, there is no broad uniformity among the states on this issue. As the Texas Supreme Court recently stated, “of the states that have considered the jurisdictional issue, some refer to the UCCJEA as a subject-matter-jurisdiction statute, while others do not. The issue is not settled.” (*In the Interest of D.S.* (Tex. May 8, 2020, No. 18-0908) 2020 Tex.LEXIS 396, at p.*20, footnotes listing cases omitted.)

“Moreover”—and more importantly—“of the cases declaring [the] UCCJEA to be a jurisdictional statute, . . . none devote analysis to *why* the statute is jurisdictional.” (*In the Interest of D.S.*, *supra*, 2020 Tex.LEXIS 396 at p. *20, fn. 83.) Our own analysis reaches a similar conclusion: although some have cited the UCCJEA drafters’ single comment noting subject matter jurisdiction (see, e.g., *In re Guardianship of K.B.*, *supra*, 2019 N.H. LEXIS 218 at p.*3; *Harshberger v. Harshberger*, *supra*, 724 N.W. at p. 153), most cases, including those in California, have not considered the issue in detail. In these cases, moreover, courts have equated UCCJEA jurisdiction with subject matter jurisdiction in situations where our distinction between mandatory rules and fundamental jurisdiction would not have affected the result. (See, e.g., *In re R.L.*, *supra*, 4 Cal.App.5th at p. 145 [affirming UCCJEA jurisdiction]; *Brewer*, *supra*, 218 Cal.App.4th at pp. 1320-1321 [reversing for lack of evidence on inconvenient forum determination]; *In re Gloria A.*, *supra*, 213 Cal.App.4th at pp. 480, 484 [reversing for lack of UCCJEA jurisdiction where issue was raised below]; *In re Jaheim B.*, *supra*, 169 Cal.App.4th at p.

24

1350 [affirming UCCJEA jurisdiction]; *H.T. v. Cleburne County Dept. of Human Resources*, *supra*, 163 So.3d at p. 1067 [same]; *Jackson v. Sanomi* (Ga. 2013) 292 Ga. 888, 889 [affirming lack of UCCJEA jurisdiction]; *Stauffer v. Temperle*, *supra*, 794 N.W.2d at pp. 319-323 [reversing for lack of UCCJEA jurisdiction where issue was raised below]; *Schroeder v. Schroeder* (Minn. Ct. App. 2003) 658 N.W.2d at pp. 911-913 [same]; *Friedman v. Eighth Judicial Dist. Court of Nev.* (Nev. 2011) 127 Nev. at p. 845, 854 [granting writs in light of lower court's erroneous assertion of UCCJEA jurisdiction]; *Officer v. Blankenship*, *supra*, 555 S.W.3d at pp. 452-453, 458-459 [reversing for lack of UCCJEA jurisdiction where issue was raised below]; *Gharachorloo v. Akhavan*, *supra*, 67 A.D.3d at p. 1014 [affirming lack of UCCJEA jurisdiction]; *Harshberger v. Harshberger*, *supra*, 724 N.W.2d at pp. 152, 157 [reversing for lack of UCCJEA jurisdiction where issue was raised below]; *Rosen v. Celebreeze*, *supra*, 883 N.E.2d at pp. 242, 250 [same]; *Rosen v. Rosen*, *supra*, 222 W.Va. at pp. 405, 407 [affirming UCCJEA jurisdiction]; *Harignordoquy v. Barlow*, *supra*, 313 P.3d at pp. 1268-1269 [same].)

Only in a few cases we have come across could a determination that UCCJEA jurisdiction is not fundamental jurisdiction have reasonably changed the result, but even in some of these courts have presumed UCCJEA jurisdiction to be fundamental without extended analysis. (See *In re Guardianship of K.B.*, *supra*, 2019 N.H. LEXIS 218 at *3-*4 [trial court denied petition to modify or terminate guardianship filed by biological mother with no clear indication UCCJEA jurisdiction was raised; New Hampshire Supreme Court ordered petition dismissed for lack of UCCJEA jurisdiction and did not

reach merits]; *In re Aiden L.*, *supra*, 16 Cal.App.5th at pp. 512, 516, 520-521, 523 [vacating termination orders where agency did not raise, and juvenile court did not address, UCCJEA jurisdiction, but equated UCCJEA jurisdiction with fundamental jurisdiction in passing].)  Thus, upon closer inspection, the determinative issue is actually not so much split among courts as it is simply undecided.

Finally, as we have earlier discussed, "jurisdiction" can mean different things, and we can find no indication in the legislative history that our Legislature intended "jurisdiction" in section 3421 to mean fundamental jurisdiction when it enacted the UCCJEA, or that it intended to create a UCCJEA exception to the near-total prohibition of collateral attacks on termination orders in dependency cases.  There is no indication, furthermore, that the Legislature thought the model UCCJEA drafters' singular reference to "subject matter jurisdiction" was accurate, or that it was aware of it.

Given the lack of an articulated reason in our cases why UCCJEA should be seen as governing nonwaivable, nonforfeitable, fundamental jurisdiction—as opposed to a mandatory rule that is waivable and forfeitable—as well as the heavy finality interests at stake, we do not follow the language in those cases that seem to equate UCCJEA jurisdiction with fundamental jurisdiction.  Instead, we agree with those cases that hold that the UCCJEA does not implicate fundamental jurisdiction.  (See *Kenda v. Pleskovic* (D.C. Ct. App. 2012) 39 A.3d 1249, 1253-1257 [holding that a party who "avail[ed] herself" of an Indiana court's jurisdiction is "judicially estopped" from challenging that jurisdiction in the District of Columbia]; *McCormick v. Robertson* (Ill. 2015) 28 N.E.3d

26

795, 803 ["As used in the statute, 'jurisdiction' must be understood as simply a procedural limit on when the court may hear initial custody matters, not a precondition to the exercise of the court's inherent authority."]; *Williams v. Williams* (Ind. 1990) 555 N.E.2d 142, 145 ["The jurisdictional limitations imposed by the [predecessor act to the UCCJEA] are not equivalent to declarations of subject matter jurisdiction, but rather are refinements of the ancillary capacity of a trial court to exercise authority over a particular case. This exercise of authority is waivable."]; *Hightower v. Myers* (Miss. 2010) 304 S.W.3d 727, 733 [noting that cases holding the UCCJEA's predecessor act as governing "'subject matter jurisdiction'" "is no longer valid law" and that "[s]ubject matter jurisdiction is governed by article V of the Missouri Constitution"]; see also *In the Interest of D.S.* (Tex. May 8, 2020, No. 18-0908) 2020 Tex.LEXIS 396, at *6 (conc. opn. of Lehrmann, J.) [agreeing with those cases "in which the courts properly treat a court's erroneous application of the UCCJEA's requirements as just that: error, not lack of subject matter jurisdiction" and noting that such a result is "consistent with the modern trend . . . away from classifying statutes as jurisdictional in the true subject-matter sense in the absence of clear legislative intent to that effect"].)[5] We could see the result differing in a state that did not bar collateral attacks on termination orders, or in a state whose legislature clearly intended its UCCJEA to regulate the fundamental jurisdiction of

---

[5] In *In re Custody of A.C.*, *supra*, 165 Wash.2d at pages 573, 577, footnotes 3, 8, the Washington Supreme Court noted that the UCCJEA "might have more accurately used the term 'exclusive venue' instead of 'subject matter jurisdiction'" and that "Washington courts did, in fact, have subject matter jurisdiction over the parties and the issues," but it nevertheless construed UCCJEA jurisdiction as nonwaivable.

27

its courts.  But given the statutory scheme in our state, we do not construe California's UCCJEA in such a way.

### 4. *The UCCJEA and Waiver*

As a final point, we note that our cases have stated UCCJEA jurisdiction may not be conferred by mere presence of the parties or by stipulation, consent, waiver or estoppel.  (See, e.g., *In re Aiden L.*, *supra*, 16 Cal.App.5th at p. 516; *In re R.L.*, *supra*, 4 Cal.App.5th at p. 136; *Schneer v. Llaurado*, *supra*, 242 Cal.App.4th at p. 1287; *In re A.M.*, *supra*, 224 Cal.App.4th at p. 598; *Brewer*, *supra*, 218 Cal.App.4th at p. 1317; *In re A.C.*, *supra*, 130 Cal.App.4th at p. 860.)  That proposition is consistent with the conclusion that UCCJEA jurisdiction is fundamental jurisdiction, as "'"[f]undamental jurisdiction cannot be conferred by waiver, estoppel, or consent"'" (*Kabran*, *supra*, 2 Cal.5th at p. 339).

However, the case establishing the proposition in the UCCJEA context was *In re Marriage of Ben-Yehoshua* (1979) 91 Cal.App.3d 259 (*Marriage of Ben-Yehoshua*), where, in interpreting the predecessor to the UCCJEA, the Court of Appeal stated that "there is no provision in [the predecessor act] for jurisdiction to be established by reason of the presence of the parties or by stipulation or consent."  (*Id.* at p. 264; see also *In re Marriage of Hopson* (1980) 110 Cal.App.3d 884, 891-892 [making same statement].)  This statement from *Marriage of Ben-Yehoshua* is true so far as it goes—the UCCJEA, like its predecessor, has no provision stating that physical presence, stipulation, or consent alone can confer jurisdiction.  (See § 3421, subd. (c) ["Physical presence of, or

28

personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination."]; but cf. § 3427, subd. (b)(5) [court with UCCJEA jurisdiction may decline jurisdiction and determine it is an inconvenient forum based on, among other factors, whether there is an "agreement of the parties as to which state should assume jurisdiction"].)

Over time, however, this statement from *Marriage of Ben-Yehoshua*, *supra*, 91 Cal.App.3d 259 has evolved into a statement that UCCJEA jurisdiction can never arise from stipulation, consent, waiver or estoppel.  Such a broad rule is not supported by *Marriage of Ben-Yehoshua* or the UCCJEA itself.  (Compare *Plas v. Superior Court* (1984) 155 Cal.App.3d 1008, 1013-1014 [citing *Marriage of Ben-Yehoshua* for the statement that "[t]here is no provision in [the predecessor act] for jurisdiction to be established by reason of the presence of the parties or by stipulation or consent"] with *In re A.C.*, *supra*, 130 Cal.App.4th at p. 860 [citing *Plas* and *Ben-Yehoshua* for the statement that UCCJEA jurisdiction "cannot be conferred by stipulation, consent, waiver, or estoppel"].)  The UCCJEA merely contains no provision affirmatively providing for jurisdiction by such means, and it does not go further.  The absence of such a provision in the UCCJEA does not mean that it establishes fundamental jurisdiction.  Accordingly, the UCCJEA does not require that a parent such as A.W. should be allowed to silently accede to jurisdiction, or neglect to raise it, for years while parental fitness is adjudicated, only to assert a lack of jurisdiction for the first time after a termination order.  We therefore find

29

that the *Marriage of Ben-Yohushua* rule does not show that UCCJEA jurisdiction is fundamental jurisdiction.

### 5. Conclusion

The UCCJEA does not govern fundamental jurisdiction. As a result, A.W.'s contention that the juvenile court lacked UCCJEA jurisdiction "cannot be raised for the first time on appeal" (*Kabran*, *supra*, 2 Cal.5th at p. 347). The issue has been forfeited.

## IV. DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAPHAEL _____
J.

We concur:

RAMIREZ _____
P. J.


FIELDS _____
J.